## MAYOR AND CITY COUNCIL OF BALTIMORE ET AL. *vs.* THE FAIRFIELD IMPROVEMENT COMPANY ET AL.

*Nuisance—Public Nuisance Authorized by the Legislature—Pest Houses—Leprosy—Injury to Private Property—Coming to a Nuisance—Abandonment of Hospital for Contagious Diseases— Prescriptive Right to Maintain Private Nuisance—Injunction.*

The Legislature may, in the exercise of its police power, authorize a municipal corporation to do an act, which if done without such authority would be a public nuisance, and the act so done consequently furnishes no ground for civil or criminal proceedings at the instance of the State.  But the right of an individual to complain of special injury suffered by him in consequence of such act is not generally impaired by a general grant of power.

The authority given by statute to a municipal corporation to establish both within and beyond the city limits hospitals and pest-houses for the treatment of contagious and infectious diseases does not of itself authorize the corporation to establish a pest-house in a locality where it would be a nuisance, exposing other persons to contagion, or relieve the municipality from all liability for injury to adjoining property.

There can be no prescriptive right to maintain a public nuisance, but there may be such right to maintain a private nuisance.

If a pest-house established by a municipal corporation under legislative authority is not a nuisance when erected, because placed in a secluded locality, persons who afterwards locate near it are not, if injured by its subsequent use, debarred of redress, merely because they have chosen to reside in that vicinity, provided the right to maintain the pest-house has not become indefeasible by prescription.

Whether the danger to contagion from leprosy be great or little, the disease is universally regarded with horror, and the placing of a person afflicted with leprosy in charge of a laborer and his wife in a settled community, without any means of restraint and confinement, is a nuisance calculated to do serious injury to property in that vicinity.

Such a disposition of a person afflicted with leprosy ordered to be made by the Health Commissioner of Baltimore City is not the establishment of a hospital under the grant of power contained in Code of Public Local Laws, Art. 4, sects. 378, 409.

A twenty-acre tract of land in a country district had formerly been

used by the city of Baltimore as a quarantine hospital for contagious and infectious diseases.   About fifteen years ago this hospital ceased to be used for such purpose, the buildings were burned down, a sale of the property ordered to be made and a new quarantine hospital was established elsewhere.   After such abandonment plaintiffs purchased lots in the neighborhood of the old hospital and erected houses thereon.   The health officers of the city directed that a woman afflicted with leprosy should be placed on its former hospital site, in charge of inexperienced persons without legal right to detain her.   *Held*, that since the use of the city's property for such purpose would cause serious injury to the property of the plaintiffs, who had located there in the belief that the pest-house formerly used in that locality had been abandoned and would constitute a nuisance, and since the city had no prescriptive right to maintain a private nuisance at that place an injunction should be granted restraining the defendants from making such disposition of the leper.

Appeal from a decree of the Circuit Court of Baltimore City (DENNIS, J.), by which it was adjudged that " it appearing to the Court that the defendants have abandoned as a hospital or pest-house the property spoken of in the proceedings and known as the old " Quarantine Hospital," and that, consequently, neither the Mayor nor the Commissioners of Health has the power to send to said abandoned property the leper woman, Mary Sansone, named in the proceedings, to be there received and kept by Mr. and Mrs. Hemstetter under the agreement stated in the testimony ; and it further appearing to the Court from the testimony that the sending of said leper woman to said premises, there to be received and kept, as proposed under said agreement, will be manifestly most injurious to the plaintiff, the Fairfield Improvement Company, and will greatly depreciate the market value of its property, for which it will have no adequate remedy at law ; and it further appearing that the defendants can readily send said leper woman, Mary Sansone, at a moderate cost, to its hospital at Hawkins' Point, where she can receive proper care and treatment, and be subject to supervision not possible to be given to her under the proposed arrangement with Mr. and Mrs. Hemstetter, and that upon these grounds the plaintiffs are entitled to relief. It is thereupon, this 16th day of December, 1897, ad-

judged, ordered and decreed, that the defendants be, and they are hereby, strictly prohibited and restrained from sending, or taking, or securing, or receiving, or keeping in the said quarantine hospital, the leper woman, Mary Sansone, named in the proceedings, and from using the said premises as a pest-house for the reception and treatment therein of the said leper, Mary Sansone."

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, ROBERTS, BOYD and PEARCE, JJ. (March 8, 1898).

*Thomas Ireland Elliott, City Solicitor,* and *Louis Putzel, City Attorney* (with whom was *Thomas G. Hayes, City Counsellor,* on the brief), for the appellant.

Code Public Local Laws, Art. 4, secs. 409 and 378 expressly authorize the Mayor and City Council of Baltimore to establish hospitals or pest-houses within or without the city and to prevent the spread of contagious diseases. But even without such authority they would have the right to purchase and hold extra-territorial lands for a hospital or pest-house. 2 *Dillon on Mun. Corp.,* sec. 565. The same writer suggests that a city might under legislative authority condemn land for the purpose of establishing a hospital thereon, even though the consequential effect would be to injure or depreciate the market or actual value of property in the neighborhood. 2 *Dillon, Mun. Corp.,* sec 587*d.* If we may apply these principles to the present case, it seems fair to us to conclude that the Fairfield Improvement Company, composed as it is of persons who have become interested in real estate near to the quarantine grounds, since those grounds were purchased and established by the Mayor and City Council of Baltimore, as a place for the care and treatment of contagious and infectious diseases, have no right either to ask an abandonment by the Mayor and City Council of the use of the land for the purposes mentioned, or to

object to its continued use for such purposes. It is to be noted in this connection that the resolution of the Mayor and City Council of Baltimore, which is taken to be an abandonment of the old quarantine station, was not approved until March 12, 1896, while the said Fairfield Improvement Company purchased the property which they now own as long ago as the 26th day of October, 1891, when there was no intention, either expressed or implied, on the part of the Mayor and City Council of Baltimore, to abandon said ground. Surely it cannot be claimed that the Fairfield Improvement Company were led to purchase their land by the belief that the Mayor and City Council of Baltimore would not send contagious or infectious cases to its hospital on the old quarantine grounds.

LORD HARDWICKE refused an injunction to stay the building of a hospital for people infected with smallpox prayed for by people living " very near." He put the pertinent question as to whether it would not be condemning all hospitals as nuisances. *Baines* v. *Baker*, Ambler, 158. He says : " It is a charity like to prove of great advantage to mankind ; such a hospital must not be far from a town, because those that are attacked by that disorder in a natural way, may not be in a condition to be carried far." He again refused an injunction in a similar case, saying: " The fears of mankind, though they be reasonable ones, will not create a nuisance." *Garth* v. *Cotton.* 3 Atk. 751.

The Legislature could legalize what might otherwise be a nuisance. The Legislature having authorized the Mayor and City Council of Baltimore to erect hospitals and pest-houses either within or without the city limits, has prevented such hospitals or pest-houses when erected from being deemed a nuisance. *Murtha* v. *Lowell*, 44 Northeast Reporter, 347. And an injunction will not be granted to restrain the Mayor and City Council of Baltimore from sending a patient to its hospital unless the Health Commissioner be clearly shown to be acting in excess of the powers granted him by law. 10 *Amer. and Eng. Cyc.* 959.

Courts will not enjoin a threatened nuisance.   When the existence of the nuisance will depend upon how the premises are used and kept no injunction will be granted.   *Cliff* v. *School Directors*, 45 Ills. Appeals, 419 ; *Pfingst* v. *Senn*, 94 Kentucky, 556 ; *2d Wood on Nuisances*, sec. 797.

If there is a nuisance at all in this case it is a public nuisance, for which no private action exists.   No action lies for damages of the same kind as those suffered by the general public, although the damages be much greater in measure. *City of Chicago* v. *Union Bldg. Asso.*, 102 Ills. 380–393 ; *Schall* v. *Nausbaum*, 56 Md. 514.

*John Prentiss Poe* and *Enoch Harlan* (with whom were *Robert Moss* and *J. Charles Linthicum* on the briefs ), for the appellees.

The placing of this leper woman in this place, at this time and in the manner contemplated, would be a nuisance.   That equity will restrain certain nuisances by injunction is well settled.   The fact that the defendant is a municipal corporation makes no difference.   *Dillon's Municipal Corporation*, page 448.   Note.   *Haag* v. *County Commissioners*, 60 Ind. 511.   The Fairfield Improvement Company has a standing in Court in this case because the testimony shows that it will suffer the most serious, immediate and irreparable damage, and that the residents on its land cannot enjoy the peace and comfort of their homes.

The act contemplated will produce such a nuisance that equity will relieve against it by injunction.   The true criterion as to whether a nuisance is sufficient for a Court of Equity to interfere by injunction is, " whether the nuisance complained of will or does produce such a condition of things as, in the judgment of reasonable men, is actually productive of actual physical discomfort to persons of ordinary sensibilities, and of ordinary tastes and habits, and as in view of all the circumstances of the case is unreasonable, and in derogation of the rights of the complainant."   *Dittman* v. *Repp*, 50 Md. 522.   " The real question in all the

cases is the question of fact, viz., whether the annoyance is such as materially to interfere with the ordinary comfort of human existence." *Susquehanna Fert. Co.* v. *Spangler*, 86 Md. 562. " The remedy in equity to prevent a nuisance is generally said to exist whenever the nature of the injury is such, that it cannot be adequately compensated by damages, or will occasion a constantly recurring grievance." " The doctrine is well settled, that where the nuisance operates to destroy health, or impair the comfortable enjoyment of property, an action at law furnishes no adequate remedy, and protection by injunction must be given." *Woodyear* v. *Schaefer*, 57 Md. 13 ; *Gilford* v. *Hospital*, 1 N. Y. Sup. 448 ; *Bendelow* v. *Guardians*, 36 W. R. 168. The testimony of every witness examined on behalf of the complainants, and of Dr. Osler, examined on behalf of the defendants, is in effect, that unless the defendant is enjoined, the result will be naturally productive of actual physical discomfort to persons of ordinary sensibilities, they unite in saying that in their judgment the people now living in the vicinity would be so discomforted that they would move ; that prospective purchasers of lots would not buy, and that the public resorts would be shunned by the general public.

The defendants also claim a legal right, by virtue of acting within the scope of power given them by legislative grant, to place this woman at this place. The defendants say that this old residence fitted up by them *is* a pest-house. They reason that it is near enough to the old pest-house burned by them, to be a continuation of it. That this original pest-house was presumably erected by them in conformity with the permission given by Art. 4, section 409, P. L. L. They do not pretend that *this house to be used* was made a pest-house by the Mayor and City Council in conformity with the section before referred to. Now, while it is true that equity will not restrain an Act specially authorized by the Legislature, yet equity will review Acts done, or in contemplation, and claimed to be done in accordance with this power so granted ; and in that review will see that the rea-

son and spirit of the Act are complied with ; that the power granted is used in reason. *Wood on Nuisances*, 3d ed., sec. 753 ; *Vansant* v. *Harlem Stage Co.*, 59 Md. 330. In *Asylum* v. *Hill*, 44 L. T. Rep. 653, the defendants had built a pest hospital by authority of a certain Act. Nearby owners proved that the place was so conducted as to be a nuisance. Held (affirming Court below) "that as the Act did not authorize any interference with private rights, nor necessarily require anything to be done under it which might not be done without causing a nuisance, the fact that the appellants had acted *bona fide* in discharge of their duties under the Act was no defence," and equity should enjoin. See also *Bendelow* v. *Guardians*, 36 W. R. 168 ; *Canal Co.* v. *Shugar*, 6 Ch. 483 ; *Atty.-Genl.* v. *Acton*, 22 Ch. Div. 221. Conceding that the original pest-house was properly established in conformity with the power granted by the Legislature in this Act, it does not follow that this old house, near the original pest-house, can be fitted up 14 years after the old house was abandoned.

If it be argued that leprosy is a loathsome, dangerous and contagious disease, then in sending her to the neighborhood in question, the appellants were unquestionably establishing what in law is a nuisance, dangerous to life and health, irreparably destructive to property and property rights, and plainly within the power of the Court to restrain by injunction. *Haag* v. *Vanderburg County Commissioners*, 60 Indiana, 511.

But apart from this, the contract which Dr. McShane testifies has been made with the proposed keepers of the leper woman is in itself so indefensible and unreasonable as to call for an injunction to restrain it from being carried into effect. The property of the city at Hawkins' Point is in every respect more available as a location for the leper. It is an isolated situation, where there is a regularly organized hospital, with a resident physician, where the woman can be constantly under guard, and where she can obtain and will have competent professional treatment. Indeed, in the face of

the fact that the city has such a place where she can be easily sent and readily cared for, the scheme of sending her over to the neighborhood of the Fairfield Improvement Company's property to be cared for by a farmer and his wife, is simply shocking. They are utterly ignorant, they will have no legal right to retain her, nor moral influence over her, and she may easily wander off. The children of her keepers will assuredly come in contact with the children at the school at which they attend, and not only will the value of the property of the people be irreparably injured, but there will be a constant menace and peril to their lives and health. Such injurious results, it is the plain duty of the County Commissioners to prevent, if possible, and no more effectual method can be suggested than that of injunction.

McSHERRY, C. J., delivered the opinion of the Court.

This appeal was taken from a decree of the Circuit Court of Baltimore City. That decree enjoined the Mayor and City Council of Baltimore from placing and keeping on a twenty-acre tract of land owned by the city an unfortunate woman afflicted with leprosy. This land adjoins property belonging to the Fairfield Improvement Company of Baltimore; and the property of the company is divided into building lots. Many lots have been sold and quite a number of houses have been built in the vicinity of the city's land. This twenty-acre tract was acquired by the city perhaps half a century ago. It is situated some three miles distant from the city and lies in Anne Arundel County. Up until the year eighteen hundred and eighty-three it was occupied as a place of quarantine against contagious diseases brought toward the city by water; and there were hospitals upon it that were used for the isolation and treatment of similar diseases originating or found in the city during the prevalence of epidemics. In or about the year just named the Mayor and City Council purchased other property, located near Hawkins' Point, some sixteen miles distant from the city, and there established a quarantine station,

which has ever since been in charge of a resident physician selected by the city. There have been no cases of contagious or infectious diseases treated upon this twenty-acre lot or tract since eighteen hundred and eighty-two or three; and it was subsequent to that time that the Fairfield Improvement Company's property was developed. A great many persons—chiefly employees of fertilizer and other factories—now reside in Fairfield; and doubtless they located there in the belief that the city had permanently abandoned the hospital and pest-houses formerly used in that locality.

The ground upon which the relief by injunction was sought is, the apprehended injury to the company's contiguous property by the placing of a person suffering with such a loathsome and horrible disease in close proximity thereto.

The statute law of the State confers upon the Mayor and City Council plenary power to establish, both within and beyond the city's limits, hospitals and pest-houses for the isolation and treatment of contagious and infectious diseases. *Secs. 378, 409, Art 4, Code Public Local Laws.* The preservation of the public health renders such legislation highly essential, and the authority of the General Assembly to enact it, in the exercise of the police power of the State, is beyond question or controversy. Within the scope of the power thus granted the whole authority of the State is included and delegated (*Harrison* v. *Mayor, &c.*, 1 Gill, 264); and, therefore, whatever the State may directly do in furtherance of these objects, the municipality, clothed with a delegated power from the State, may also lawfully perform, though there may be a difference as to the legal consequences resulting from an exercise of the power by the State directly, and those flowing from an exertion of the same power by the municipality. If it be conceded that the State may, in exercising a public power, create a private nuisance with immunity, the immunity grows out of the public necessity and rests upon the State's sovereignty; but it

cannot—or at all events, will not, in the absence of an explicit legislative declaration—be assumed that the State would, if directly exercising the same power, so exercise it as to produce or cause an injury to the rights of property of an individual, unless, perhaps, the very doing of the act directed to be done will necessarily and unavoidably, under any condition, result in the creation of what would be, but for the authorization, a private nuisance. The delegation of a power to do an act, whilst conferring full authority to perform the act itself, does not, therefore, without more, essentially and without exception, carry the right to so do it as to inflict loss or injury upon an innocent individual. As thus understood the power of the municipality to erect and maintain hospitals and pest-houses may be exerted and applied precisely as the same power if not delegated could have been availed of by the State. Acts done under such delegated authority, which without that authority would in themselves be public nuisances, furnish no ground for civil or criminal proceedings at the instance of the State; for the authority to do the acts makes them, when done, perfectly lawful as respects the public; and being lawful, there is no superior public right which they invade or violate. These are what have been sometimes described as " legalized nuisances," (*Wood on Nuisances*, ch. 23), since they are *strictly necessary* and *probable* results of legislative authorization. They ultimately rest for their sanction upon the paramount power of the Legislature, and the importance of the public benefit and convenience involved in their continuance as affecting the greatest good to the greatest number. *Northwestern Fertilizing Co.* v. *Village of Hyde Park*, 97 U. S. 659. But however free from interference by the public, acts of *this character* may be when authorized to be done by a municipality under competent and sufficient legislative grant, the right of an individual to complain of the *special* injury sustained by him as a consequence of their being done is, ordinarily, in no way impaired or affected. The mere naked grant of power to a municipality to do acts, which if done without the sanc .

tion of that power would be nuisances, does not in all instances carry with it a guaranty of immunity from claims for private injuries that result directly from the exercise of the power. And this is necessarily so in the absence of an explicit or implicit legislative declaration to the contrary, because the Legislature cannot be presumed, from a general grant of authority, to have intended to sanction or legalize any acts or any use of property that will create a private nuisance which will injuriously affect the property of another. That the State may, in the exercise of the police power, and for the preservation of the public health, authorize the summary destruction of private property contaminated with the germs of disease, is thoroughly and definitively settled. *Deems* v. *Mayor, &c., Baltimore,* 80 Md. 174, 175 ; *Boehm and Loeber* v. *Mayor, &c.,* 61 Md. 259; *Mugler* v. *Kansas,* 123 U. S. 62. But there is a broad distinction between a summary destruction of an offending thing, and a direct injury to unoffending property—that is, property itself not liable to destruction because not dangerous to the public health or safety. The immediate and imminent danger to life or health justify, under the police power, the one ; whilst the other is left to be redressed in the due course of the law. However broad, therefore, may be the powers of a municipality to erect and maintain hospitals and pest-houses for the segregation and treatment of contagious and infectious diseases ; and however necessary their exercise may be, they must, generally speaking, be exerted and put into operation subject to the no less well defined right of the individual to possess and enjoy his unoffending property without the molestation of a nuisance. It cannot be pretended that the city authorities could, even under their comprehensive powers, locate a pest-house in the midst of a thickly settled community. The right to locate the pest-house does not carry with it or include the right to locate it in a place where other persons would be exposed to the contagion and disease. " Powers given by statute are not to be used to the peril of the lives or limbs of the Queen's subjects. They

are to be exercised reasonably, and with due care, so as not by negligence to cause dangers to others," observed WATSON, B., as quoted in 2 *Addison on Torts*, sec. 1041. Where commissioners of sewers and boards of health have obtained statutory powers of drainage into rivers, streams and natural water courses, the power must be exercised so as not to create a nuisance or interfere with the private rights of individuals. 2 *Add. on Torts*, sec. 1085. The mere power to erect and maintain hospitals and pest-houses does not imply or include the further power to erect and maintain them in such a way or at such a place as will cause injury to others. And so in *Brown* v. *Mayor, &c.*, 3 Barb. 254, it was held that statutory authority given to commissioners of emigration to lease or purchase docks where emigrants may be landed, will not justify them in leasing for that purpose property situated in a thickly populated part of a city where the contemplated use of the premises would be a serious menace to the health of the community. See too, *Co. Com.* v. *Wise*, 71 Md. 52, 53; *Inhab. West Orange* v. *Field*, 37 N. J. Eq. 600; *Dan. & Nor. R. R. C.* v. *Town of Norwalk*, 37 Conn. 109; *Seifert* v. *Brooklyn*, 101 N. Y. 136; *Wood on Nuisance*, sec. 764. Whatever immunity a municipality may have in exercising a *public*, as contradistinguished from a strictly *corporate* power, it does not result from some collateral act or from the negligent doing of a permissible act. The infliction of an injury upon another is neither the natural nor the necessary result of an exercise of the power to build a hospital; but if injury does ensue it would result from the collateral circumstance that the *place* selected was not the appropriate site, or from the negligent method of doing what would otherwise be a lawful act.

Assuming at this point that leprosy is a contagious disease which is a menace to the health of a community; and assuming also that the Mayor and City Council, through its Health Department, were about to utilize this twenty-acre tract of land for the first time for the erection of a pest-

house thereon for the reception of this particular patient, there can, in view of the legal principles just discussed and in the light of the facts to which allusion has been made, be no doubt as to right of the Fairfield Improvement Company to invoke the restraining aid of a Court of Equity to prevent the establishment of such a nuisance. *Wood on Nuisances*, sec. 796. But it is insisted that the company went to the nuisance, and it is denied that the nuisance went to the company, and, therefore, it is contended that the relief sought cannot be granted. Though there cannot be a prescriptive right to maintain a public nuisance, there may be such a right as to a private one. The authority given by the Legislature to the city to erect such a pest-house prevents it, when erected and used, from being a *public* nuisance. If it be no nuisance at all when erected, because of being erected in a secluded locality, persons who afterwards locate near it are not, if injured, deprived of redress merely because they have voluntarily chosen to reside in close proximity to it, if the right to maintain it has not ripened by prescription into an indefeasible right. This doctrine was settled in *Susq. Fert. Co.* v. *Malone*, 73 Md. 280–281, and is fully supported by the cases therein cited.

This brings us to an examination of the facts so that we may determine whether they fall within the principles we have been considering.

Leprosy is, and has always been, universally regarded with horror and loathing, and it is conceded to be an incurable disease. In past ages its unfortunate victims, shunned and avoided by their fellowmen, viewed by all with superstitious dread, wandered about the open country naked and starving. Hospitals for the relief of those smitten with the terrible malady seem to have been unknown in antiquity. The sufferers were eventually isolated in villages occupied by them exclusively. With the tide of emigration westward during the decline of the Roman empire, leprosy was spread over Europe, and in the middle ages it prevailed to an alarming extent—its principal ravages dating from the

first crusades.   The influence of christianity tempered the rigor of the afflicted, and as early as five hundred and eighty-three the third Council of Lyons directed the bishops of each city to feed and support the lepers at the expense of the church.   In the thirteenth and fourteenth centuries hospitals and asylums were numbered by hundreds in almost every country.   But whether isolated in villages in the East, or segregated in hospitals in the West, the leper was completely and forever an outcast, being considered both legally and politically dead.   The advance of civilization, whilst in a measure ameliorating his condition and checking the spread of the pestilence, stripped the disease of none of the dread with which it had always been regarded by the great majority of mankind.   The horror of its contagion is as deep-seated to-day as it was more than two thousand years ago in Palestine.   There are modern theories and opinions of medical experts that the contagion is remote and by no means dangerous; but the popular belief of its perils founded on the Biblical narrative, on the stringent provisions of the Mosaic law that show how dreadful were its ravages and how great the terror which it excited, and an almost universal sentiment, the result of a common concurrence of thought for centuries, cannot in this day be shaken or dispelled by mere scientific asseveration or conjecture.   It is not, in this case, so much a mere academic inquiry as to whether the disease is in fact highly or remotely contagious; but the question is whether, viewed as it is by the people generally, its introduction into a neighborhood is calculated to do a serious injury to the property of the plaintiff there located.   As to this the record leaves no room for doubt.   That the disease *is* contagious no one seems to deny.   Its liability to contaminate others is the element that makes its introduction into a community a nuisance, and when it is conceded that the purpose is to place this woman, having a fully developed and far-advanced attack of leprosy, in charge of a laborer and his wife, who have had no experience in such a case, and who have several small chil-

dren in their family, the danger of spreading the contagion is perfectly obvious. It will not do to say that the children are to be separated from their parents. There would be great hazard of their being brought in contact with the patient. The record abundantly shows that the Fairfield Improvement Company's property will be seriously lessened in value—that residents of the vicinity will abandon their homes—if this unfortunate and afflicted woman should be placed where the city proposes to confine her. On this branch of the case we entertain no doubt that the facts fully warranted the issuing of the injunction. " In all such cases the question is whether the nuisance complained of will or does produce such a condition of things as, in the judgment of reasonable men, is naturally productive of actual physical discomfort to persons of ordinary sensibilities, and of ordinary tastes and habits, and as in view of the circumstances of the case, is unreasonable and in derogation of the rights of the complainant." *Dittman & Berger* v. *Repp*, 50 Md. 521, 522; *Wood on Nuisances*, sec. 66 and note 4, and cases therein cited.

Inasmuch as the infliction of injury on any individual was not necessarily contemplated in the grant of the power referred to, that is to say, was not a necessary and inevitable consequence of an exercise of the power to maintain a hospital, the right to maintain it at this particular place in the existing circumstances, cannot be put on the ground of explicit or implicit authorization ; and it remains now to inquire whether a prescriptive right is possessed by the city to build or to continue a pest-house in the vicinity of Fairfield. Had the city never abandoned this locality as a place for the confinement and treatment of contagious diseases it is very doubtful whether its right to place this patient there could now be challenged. It is equally doubtful whether the adjoining property would ever have been improved and peopled as it now is, if the old quarantine station, hospitals and pest-houses had not been long ago discontinued. In eighteen hundred and eighty-three, when the new quarantine

property at Hawkins' Point was purchased, this twenty-acre tract was in point of fact abandoned by the city as a place for the isolation of contagious diseases. Later on, and after improvements had progressed in the vicinity, the hospital buildings and pest-houses were burned by the city health officers; and still later, a resolution was adopted by the City Council directing the sale of the property except that portion which had been used as a burying-ground for those who died during the epidemics years ago. When persons have acted on the belief, founded on such palpable evidence indicating that the city had physically abandoned this property for the isolation and treatment of contagious diseases, it is too late, especially when that physical abandonment has been followed by the passage of a resolution actually directing the property to be sold, to assert the right to restore the place to its former uses, if such a restoration would cause injury to those who have in good faith relied on the conduct of the city in actually discontinuing the use of the property for the purposes of quarantine and isolation. The conclusion of fact we draw from the record is, that there was an abandonment of this property by the city when it removed its quarantine officers and attendants to Hawkins' Point; and the city cannot now, to the detriment of the appellee, resume the occupation of this place for the detention of this patient. She must be placed elsewhere.

The evidence shows, as we have indicated, that the health authorities of the city propose to place this woman in the charge of a laborer and his wife. A contract has been made with them and under it this laborer and his wife agree to care for the patient. They are unskilled people. They possess no authority to restrain the woman from wandering away, and they have no legal right to detain her against her will. They are not officers of the city, nor clothed with any of the powers of the Board of Health. They are simply employed by the city to care for this woman on the city's property, where no health officer or city official is stationed. The mere fact that the place of her proposed

detention belongs to the city adds nothing to the power of the laborer to hold her ; and most certainly these facts do not amount to the establishment of an hospital under the power which the city possesses.  The contract is on its face unreasonable.  Its tendency is to cause a dissemination of the disease and not to protect the community ;  and for this, if for no other reason, the injunction ought to be made perpetual.

There was no error committed in granting the relief prayed and the decree appealed from must be affirmed.

> *Decree affirmed with costs above and below.*

(Decided April 1st, 1898).