## JOHN BLOCK et al. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE et al.

*Nuisance—Transportation of City Garbage—Noxious Odors and Flies—Pollution of Waters—Remedy By Injunction— Misjoinder of Causes of Action—Remedy at Law—Verification of Bill—Laches*

A bill alleging the transportation of city garbage and dead animals to a reduction plant, on open scows, with the result of collecting quantities of flies, which infected the food in plaintiffs' residences, and of creating nauseating and noxious stenches and gases, and also the operation of the plant in such a way as to pollute and cause fermentation in neighboring waters, to the detriment of plaintiffs, living thereon, *held* to show an actionable nuisance.                    p. 51

Where a contract between a city and a private corporation, for the reduction of city garbage, expressly provided that the process of reduction should be sanitary and odorless, and that it should create no nuisance or pollution of waters, the existence of such contract did not justify the operation of the plant in such a way as to create these objectionable conditions, even conceding that the city could, under its general police power, create such conditions if necessary to protect the health of its people, any such necessity being excluded by the contract provisions referred to.                    pp. 52-55

The creation of offensive and noxious stenches and fumes, and of vapors, smoke and dust, and the collection of clouds of

flies, depositing maggots on food, sickening plaintiffs while in the lawful and accustomed use of their fixed and permanent abiding places, and preventing the comfortable enjoyment of their properties, together with the deposit of slime and grease on the shores of plaintiffs owning land on a certain creek, affected plaintiffs differently from the general public, and consequently they had a private right of action.          pp. 55, 56

The mere fact that a nuisance injures one hundred persons instead of one does not prevent its being a private nuisance, the test being whether the damage is different in kind from that suffered by the general public.                                p. 56

That the Legislature has authorized a city to transport its garbage to such location as a due regard for the public health and welfare requires it to be carried to, does not empower the city unnecessarily to injure innocent persons or unoffending property by the manner in which it exercises the authority.

p. 56

While the Legislature, under the police power, may legalize what would otherwise be a public nuisance, it can do so only when such action is necessary to protect the public health or welfare, and in the absence of the most explicit expression of its intention, it will not be presumed to have legalized a nuisance due, not to necessity, but to negligence.          pp. 56, 57

Where a city transported garbage and dead animals to a reduction plant on open scows, so as to attract clouds of flies which infected food in neighboring residences, and the company operating the plant, in its operation, created noxious and offensive odors, fumes, vapors and dust, and deposited oil and slime on neighboring shores, *held* that the owners of such residences and shores were entitled to an injunction against the city, and also against the company.          pp. 52-57

A bill which alleged the creation of a nuisance by defendant city's mode of transporting garbage to a reduction plant operated by the other defendant, a private company, and that the company operated the plant in such a manner as to create a nuisance, was multifarious, as joining two wholly distinct wrongs, produced by different persons, having with respect to such wrongs no necessary connection with each other.          p. 57

A bill by tenants and owners of over forty different tracts of land, located at from two hundred yards to several miles from a certain point, to enjoin the creation of a nuisance at that point, affecting them all in a more or less similar manner, was not multifarious for misjoinder of parties plaintiff. p. 57

Where a bill charges such damages to plaintiffs by a nuisance as to entitle them to relief as mere residents of the neighborhood, they need not file as exhibits any muniments of title.

p. 58

A bill for an injunction, some paragraphs of which, stating facts material and essential to plaintiffs' case, are verified only by affidavits that the averments therein are true to the best of the affiants' knowledge, information and belief, but that they have no knowledge of the facts alleged in those paragraphs, is bad on demurrer. p. 58

That persons injured by a nuisance might recover damages on account thereof is not ground for refusing equitable relief in their favor, when the injuries include loss of sleep, nausea, and impairment of health, such damages being hard to prove and harder to measure. p. 59

That persons suffering by reason of a nuisance could perhaps induce the State Board of Health to apply for an injunction or take other steps to abate it, is not ground for refusing an application by such persons for an injunction. p. 59

That persons suffering from a nuisance, consisting of the transportation of city garbage on open scows, and the defective methods of reducing the garbage, did not seek to obtain an injunction until about three years after the commencement of such transportation and reduction operations, did not show laches on their part. pp. 59, 60

Although, by reason of the improper joinder of distinct causes of action, and the lack of proper affidavits, the bill was properly dismissed, yet since the averments of the bill showed a right on plaintiffs' part to an injunction, it was error to dismiss the bill "without prejudice" to the "rights at law" of plaintiffs, rather than simply "without prejudice." p. 60

*Decided June 30th, 1925.*

Appeal from the Circuit Court for Anne Arundel County (PARKE, C. J., and FORSYTHE, J.; Moss, J., dissenting).

Bill by John Block and others against the Mayor and City Council of Baltimore, and the Sanitary Reduction Company. From a decree dismissing the bill, plaintiffs appeal. Reversed.

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, and WALSH, JJ.

*John S. Strahorn* and *S. Ralph Warnken,* for the appellants.

*Charles C. Wallace, Assistant City Solicitor,* with whom were *Philip B. Perlman, City Solicitor,* and *Jerry L. Smith* on the brief, for the Mayor and City Council of Baltimore, appellee.

*William L. Marbury,* with whom were *Nicholas H. Green, Marbury, Gosnell & Williams,* and *Mullikin & Porter* on the brief, for the Sanitary Reduction Company, appellee.

OFFUTT, J., delivered the opinion of the Court.

On or about July 27th, 1921, the Mayor and City Council of Baltimore, hereinafter referred to as the city, contracted with the Sanitary Reduction Company, a corporation, for the disposal, by the Arnold Egerton system of reduction, of all garbage produced in Baltimore City, which, under the contract, the city agreed to deliver on scows at the reduction company's plant at Spit Point on Bodkin Creek in Anne Arundel County.

After the execution of that contract and until this suit, the city transported its garbage on scows to the reduction company's plant, where it was converted by that company into oils, grease, tankage and other products. On June 2nd, 1924, John and Lucy Block, and others occupying as tenants or owners forty-four different tracts of land located at

distances varying from two hundred yards to several miles from Spit Point, filed in the Circuit Court for Anne Arundel County, in equity, their bill of complaint against the reduction company, in which they complained that the manner in which the garbage produced in the City of Baltimore was transported to Spit Point and there reduced caused a nuisance which affected them in the comfortable enjoyment of their respective properties, and in which they prayed that an injunction issue restraining the reduction company from continuing the nuisance. A demurrer to that bill was sustained, and with the leave of the court it was amended, making the city a party defendant. Demurrers filed to the amended bill were also sustained, and the bill dismissed, and from that order this appeal was taken.

The most important question presented by the appeal, in so far as the actual and substantial rights and privileges of the parties are concerned, is whether the allegations of the amended bill make out a case for equitable relief, although, so far as the immediate litigation is concerned, the form of the pleadings raising that question is quite as important. Whilst, in the view we take of the case, the appeal might be disposed of on the objections to the form of the pleadings, yet since the conditions complained of are continuing in character and as the dismissal of the bill in this case ought not to prejudice the right of the complainant to seek relief in any other proceeding involving the same facts, we feel that we should pass upon both questions, and we will therefore deal with them in the order in which they have been stated.

To understand the significance of the objections urged both to the formal sufficiency of the pleadings and to the right of the appellants to equitable relief upon the case made out by the bill, it is necessary to refer at some length to the bill, the accompanying affidavits, and the exhibits filed with it.

The amended bill, which is filed against both the city and the reduction company, contains fourteen paragraphs. The first paragraph alleges that all the plaintiffs own or lease

property in close proximity to Spit Point, where the reduction company is engaged in the business of receiving and reducing garbage and dead animals for profit. The second and third paragraphs set out in some detail the location and use of the several properties occupied by the plaintiffs and their respective interests therein. The fourth alleges the execution of the contract between the city and the reduction company and states the terms thereof.

The fifth charges:

"That as the garbage and dead animals are collected in different parts of the City of Baltimore it is put on board scows, holding from 175 to 250 tons each, located at one or more points in said city. When the scow becomes filled it is transported, at the expense of Baltimore City, to the reduction company's plant at Spit Point. The exact number of scows of garbage and dead animals received by the reduction company at Spit Point is not definitely known to your orators, but your orators show that at least one scow each day, and sometimes two scows a day, filled with garbage and dead animals, are sent to the reduction company's plant. The scows, while being filled in Baltimore, during transportation to, and while being unloaded at, the reduction company's plant, are open and uncovered, and exposed to the air and sun, during which time large numbers of flies and other insects gather, feed on the garbage and dead animals, and propagate in great numbers, and are brought to your orators' property and homes."

The sixth describes the process by which the garbage and dead animals are "converted" or "reduced."

The seventh alleges:

"That during the time the scows are being loaded in Baltimore City the mass of garbage and dead animals attracts large quantities of flies which feed on said garbage and propagate and remain with the scow until the contents thereof are unloaded at Spit Point. Most of the flies then disperse and come to the homes of your orators and the homes of other persons in

the vicinity of Spit Point. Your orators are unable
to adequately state the number of flies that are brought
to their homes in this way, but some idea can be got-
ten as to the number of flies from the fact, which your
orators now aver, that frequently the number of flies
on said scows as they are brought down the bay to
Spit Point are so numerous and dense that they have
the appearance of a cloud of smoke over and following
the scow. Your orators further show that the refuse
accumulated around the defendant's plant is also a
breeding place for myriads of flies. All of the afore-
mentioned flies swarm in droves throughout the neigh-
borhood, cover the beasts of the field and interfere with
the work and management of the same, penetrate the
homes of your orators who live within two or three
miles of the reduction company's plant, notwithstand-
ing the fact that doors and windows are screened, and
cover the food on the tables and in the kitchens and
pantries of your orators' homes. Especially during
warm weather, as the scows are not covered, the de-
composing garbage and dead animals get into such
condition that millions of maggots are created and
at least one variety of the flies (hereafter called mag-
got flies) feed on these maggots. Your orators further
show that the flies in their community have greatly
increased since the reduction company's plant has
been in operation, which your orators have been in-
formed, and therefore believe and aver, began operat-
ing on or about December 1, 1921, and that said in-
crease is directly due to the garbage and dead animals
transported by Baltimore City to and received by the
reduction company at its plant. That said flies, come
into the homes of your orators and swarm upon the
food upon their tables, said maggot flies depositing
maggots on said food and rendering the same most
nauseating to those about to partake thereof and mak-
ing it absolutely unfit for human beings of ordinary
sensibilities; that your orators are advised and believe
and therefore aver, that said flies are carriers of
disease and that their presence in the homes of your
orators, after said flies have fed on the garbage and

refuse on said scows and in and about the reduction
company's plant, is apt to promote disease and epi-
demics of disease in the homes of your orators and in
the community generally."

The eighth avers that the operation of its plant by the
reduction company results in the discharge of large quanti-
ties of poisonous liquids, oil and decomposed matter into the
waters of Bodkin Creek, which

"has absolutely ruined the waters of Bodkin Creek
for all useful purposes and purposes of pleasure for
which your orators, living thereon, have used the
same. A large part of the surface of said waters is
covered by a thick oily slime, the waters have become
discolored and the poisonous gases and liquids and
decomposed matter which the said reduction company
deposits into said waters has caused fermentation and
frequently the waters of said Bodkin Creek at various
places in the vicinity of the reduction company's plant
are seen to spout up or boil or bubbles form thereon,
due to fermentation of the matter on the bottom of said
creek which your orators charge is caused by the
pollution of said waters by the poisonous gases, liquids,
and decayed garbage and dead animals which are
deposited therein by the reduction company."

And it further alleges that as a result of these conditions
the shores of the properties of those of the plaintiffs who own
land on Bodkin Creek are covered with an oily slime, and
that it is impossible for the plaintiffs to boat, swim or fish
in said waters, or to use them to keep fish or crabs alive in
"live boxes" therein.

The ninth paragraph states:

"that the odors from the reduction company's plant,
especially the odor which emanates from the stack
into which the steam and dust escapes from the tank-
age as it is being dried, is a horrible nauseating stench
which, on damp and still days, permeates the atmos-
phere in all directions within a radius of three to
five miles of the reduction company's plant and on

clear days, when a wind or breeze is blowing, travels
for a like or even greater distance, that on damp and
still (clear or cloudy) days, and this is very frequently,
the odor passes from the reduction company's plant
in the form of a fog which is so thick and so large
in volume that persons using the public roads within
a large radius of the reduction company's plant and
over which said fog has settled are required to light
the lights of their automobiles in the day time in
order to see their way; that said odor is and has been
of such a character and degree that it is impossible
for any person possessed of ordinary sensibilities,
tastes, habits and refinement to live in a radius of
three to five miles of the reduction company's plant
without actual physical discomfort and inconvenience;
that said odor is so intensely sickening and disagree-
able that many of your orators find it necessary to
keep the windows of their homes closed for days at
a time and even then it gets into your orators' houses;
that the gases which are a part of said odor irritate the
throats of your orators and cause their eyes to burn or
smart, and frequently after your orators have retired
for the night, they have been awakened from sound
sleep by the suffocating effect of said odor and gases
and have been unable to get to sleep again, thereby
causing considerable loss of sleep to your orators;
that said odor is so nauseating that it turns the stom-
achs of persons of ordinary sensibilities and makes it
impossible for your orators to eat their meals in com-
fort or at times to eat such meals at all.    That on
clear days when the wind or breeze is blowing briskly,
except as to those of your orators who live very close
to the reduction company's plant and who are always
subjected to said odor, the odor only affects those of
your orators who are located in a direction from the
reduction company's plant from which the wind is
blowing; that said odor and gases are such that actual
physical discomfort is caused to your orators in the
ways above stated and the health of your orators and
members of their families are gradually being im-
paired."

The tenth states that the conditions complained of are practically continuous. The eleventh charges that these conditions subject the plaintiffs to great annoyance and physical discomfort, impair their health, depreciate the value of their property, and hinder the sale thereof. The twelfth alleges that methods exist by which the garbage can be disposed of without inconvenience, annoyance or discomfort to others. The thirteenth avers that the County Commissioners of Anne Arundel County appointed a committee to inspect the plant of the reduction company, and that that committee reported that it was a nuisance, a menace to the health and comfort of the residents of the surrounding country, and should be abated. The fourteenth alleges that the plaintiffs have no adequate remedy or redress at law.

The bill then asks for the following relief:

"1. That the defendant, the Mayor and City Council of Baltimore, be temporarily and permanently prohibited and enjoined from sending or bringing from Baltimore City to Spit Point or into Bodkin Creek any scows or open boats containing garbage or dead animals unless the scows are fully covered at the time they leave the dock at Baltimore City and remain covered until received by the defendant, The Sanitary Reduction Company, so that the contents of said scows or open boats will not be exposed to flies or other insects.

"2. That the defendant, The Sanitary Reduction Company, be temporarily and permanently restrained and enjoined from receiving any scows or open boats containing garbage or dead animals from the Mayor and City Council of Baltimore unless said scows or open boats are covered so that the contents will not be exposed to flies or other insects and that said The Sanitary Reduction Company be required to keep said scows or open boats covered as aforesaid until it starts to unload the same.

"3. That the defendant, The Sanitary Reduction Company, be temporarily and permanently restrained and enjoined from disseminating disagreeable odors,

gases and stenches as herein alleged by the operation of a dryer or by any other means which may produce similar results.

"4. That the defendant, The Sanitary Reduction Company, be temporarily and permanently restrained and enjoined from emptying into the waters of Bodkin Creek any solid matter and any liquids and gases dangerous to fish and crab life and from polluting the waters of said Bodkin Creek as herein alleged.

"5. And for such other and further relief as the nature of your orators' case may require."

There are two affidavits attached to the bill, one of John F. Shipley, who verifies one sub-paragraph of paragraph two, paragraphs seven, eight, nine, ten and thirteen and part of eleven; and one of John Block, who verifies one sub-paragraph of paragraph two, and paragraphs five, seven, eight, nine, ten and thirteen and parts of paragraphs six and seven.

The specifications embodied in the reduction company's bid, and forming a part of the contract referred to in the bill, a copy of which was filed with it as an exhibit, contain the following clauses, which are to some extent relevant to the questions before us:

"The City of Baltimore produces daily, considerable quantities of garbage and dead animals. These wastes are now being collected by city forces, hauled by them to dumping stations on the water front near the center of the city and thence removed by city owned scows to a disposal site on the Patapsco River. The city intends to continue the collection of these wastes by city forces, but to dispose of them by contract.

"The city proposes to deliver the wastes to a contractor either—

"(a) By water on the city scows alongside of wharf within reasonable towing distance of the present city water front dumping stations. * * *

"Wherever the term 'garbage' is used in this contract, it shall be liberally construed and shall be taken to include every accumulation of animals, fruit or vegetable food waste, containing not more than five

per cent by weight of other refuse, generated by or re-
sulting from the decay, deterioration, storage, prepara-
tion or handling of animal and vegetable matter in
any place or at any point where food is prepared for
human consumption, including all kitchen and din-
ing-room refuse produced by households, hotels, res-
taurants, lunch rooms, clubs, hospitals or any other
source whatsoever existing in the City of Baltimore,.
Maryland. * * *

"All receptacles, vehicles, scows and conveyances
used by the contractor shall be so constructed and
loaded as to prevent the garbage or any part thereof
from falling upon or into and defiling or polluting
the streets, roads or waters, upon which the garbage
is transported or adjacent to the dumping stations and
such receptacles, vehicles, scows and conveyances shall
be kept and maintained in a clean and sanitary con-
dition to the satisfaction of the Commissioner of Street
Cleaning.  All receptacles, vehicles, scows and con-
veyances used by the contractor in the transportation
of garbage from all sources and dead animals shall
be covered with covers so arranged as to completely
enclose, during transportation, the materials that may
be loaded thereon. * * *

"The intent of the contract and specifications is to
provide for the reception, transportation, removal and
final disposition by the contractor in a sanitary man-
ner so as not to create a nuisance or violate any law,.
ordinance or regulation of the City of Baltimore or
State of Maryland, of all garbage, dead animals and
market refuse, and if so proposed in his bid, of all
rubbish, exclusive of ashes, produced by the City of
Baltimore and delivered to the contractor by the
city. * * *

"In case the contractor makes final disposition of
said garbage and dead animals at a plant located on
the Patapsco River or its tributaries within thirteen
nautical miles by water of the Lazaretto Light House,
to which delivery of said garbage and dead animals
may be made by scows, then the city will deliver said
garbage and dead animals on scows alongside of the

wharf at the disposal plant of the contractor. The contractor shall unload the scows promptly and have them ready for removal within twelve hours after their delivery at the wharf, but in the unloading time of twelve hours, the interval between sunset and sunrise will not be counted. * * *

"All garbage and dead animals' produced within the limits of the City of Baltimore shall be so handled and disposed of at the contractor's plant, as to prevent the creation of offensive odors of any kind while being handled, treated or reduced. The process, machinery and apparatus shall be thoroughly sanitary in effect, and the plant shall be so constructed as not to cause conditions which will be detrimental to the public health or comfort, or in any way constitute a public nuisance. * * *

"All water flowing from the plant shall be inoffensive and free from nuisance or any matter detrimental to the public health or to the oyster beds of fish life in the Chesapeake Bay or its tributaries. * * *

"The buildings and approaches shall at all times be kept in a clean and sanitary condition. All gases of combustion shall be completely oxidized before their release into the air. Combustion shall be rapid and complete, insuring at all times and seasons the reduction of all materials to a mineral ash free from organic matter."

It is obvious from this statement of its contents that the bill contains some allegations which properly have no place in it, and that it lacks others which it should contain, but nevertheless, if we assume, as the demurrer requires us to do, that the facts alleged in it exist, it would be a reproach to the law if it afforded to the plaintiffs no adequate relief from the burdensome and intolerable conditions shown by those facts.

Those conditions, in our opinion, constitute an actionable nuisance (*North. Cent. Rwy. Co. v. Oldenburg & Kelley,* 122 Md. 244), but the appellees contend that while the appellants may upon a proper showing recover in an action at

law for the damages suffered by them in consequence of that nuisance, its continuance cannot be enjoined because it has been sanctioned by the Legislature.

That contention appears to be based upon the proposition that the city was authorized to make the contract in this case, and to cause the establishment and operation of the plant at Spit Point, under the "broad police power" as well as the specific powers granted to it by the Legislature, and that what the reduction company has done it has done as the city's agent, and as such is entitled to the same privileges and immunities which the city would have were it doing directly what the reduction company is doing for it.

That proposition, whatever may be said of the abstract legal principles involved in it, has no real relation to the facts of this case. It nowhere appears in the record that the nuisance complained of has any necessary connection with the contract made by the city. Of course, it is true that if the city had not agreed to deliver to the reduction company all of its garbage and to pay it for the reduction thereof, that company might not have had any garbage to reduce and probably would have caused no nuisance, but on the other hand the nuisance complained is in direct violation of the express terms of the contract. And it would be odd if the reduction company could justify its maintenance of the nuisance by a contract in which it agreed not to do the very things which it does and of which the appellants complain, and which constitute the nuisance of which they complain.

In dealing with the case made out by the bill it is not necessary to consider whether the State, acting through the Legislature, has the power to authorize the city or any agency thereof to maintain conditions which must injuriously affect the property, health and comfort of individuals, without regard to the right of such persons to the quiet and comfortable enjoyment of their property, nor to decide whether, through the operations incident to the transportation and disposal of garbage and dead animals produced in Baltimore City, the appellees have appropriated and "taken"

the property of the plaintiffs, or any interest therein.  Because in the first place the Legislature has not, so far as the record shows, attempted to exercise any such power, nor has the city claimed any such authority.  The general welfare clauses and provisions of the city charter, authorizing it to take such steps as may be necessary to promote the welfare of the city, to insure the security of its inhabitants, and to protect the public health, can scarcely be pointed to as authority for the operation for profit by a private corporation, wholly independent of the city government, of a plant outside of the city limits for reducing and disposing of the garbage and dead animals produced in the city, in such a manner as to create imminent danger of disease and pestilence in the community in which it is located, to affect the health and comfort of the inhabitants thereof, and to deprive them of their right to the quiet, comfortable and usual enjoyment of their property.  If the Legislature had meant to grant a power so important and oppressive, it would have done so in clear and explicit terms, and would not have left it to vague, conjectural and speculative inference.  It may be conceded that such a power might become necessary to secure the public health and welfare of the inhabitants of the city, but in such a case the Legislature, upon being satisfied of the necessity therefor, could not grant it without making suitable provision for the protection of private rights.  But in this case it has not attempted to grant it.  Nor has the city assumed that it has, for in its contract with the reduction company it provided with the most exacting care for the prevention of injury to individuals by the disposal of the garbage and dead animals delivered to it by the city.

The conditions complained of, resulting from the operation of the reduction company's plant, are not occasioned by what that company does under its contract with the city, but by what it does in violation of that contract.  Under the contract the reduction company agreed in terms that the entire process of reduction would be "thoroughly sanitary and odorless"; that it would cause no nuisance through

the escape of gases or dust from the building or stack; that all water flowing from its plant would be "inoffensive and free from nuisance or any matter detrimental to the public health or to the oyster beds or fish life in the Chesapeake Bay or its tributaries"; that all gases would be thoroughly deodorized before being released into the atmosphere; and that all garbage and dead animals delivered to it would be so handled as to prevent the creation of offensive odors of any kind. And yet the bill charges that the reduction company in violation of those promises so operates its plant as to pollute the waters of Bodkin Creek by depositing therein poisonous gases, liquids, decayed garbage and dead animals, and to emit from its plant, and especially from the stack into which the steam and dust from the tankage escapes, "a terrible nauseating stench" and gases in the form of a thick fog, which irritates the throats and eyes of those in the neighborhood of the plant, interferes with their sleep, and nauseates and "turns the stomachs" of persons of ordinary sensibilities.

The appellees relied upon *North. Cent. Rwy Co. v. Oldenberg & Kelley, supra,* in support of the principle that the Legislature may legalize what would otherwise be a public nuisance and that damages resulting from its maintenance or establishment which do not amount to a taking of property will not justify a court of equity in restraining its continuance. If that principle be conceded, it does not help the appellees at all, for as we have already stated, in our opinion, the Legislature has not directly or by necessary implication sanctioned the nuisance complained of. There is nothing in the facts stated in the bill which warrant the inference that in order to dispose of the city's garbage and dead animals it is necessary to cause the conditions complained of, but on the contrary, it affirmatively appears that it is not. The city demanded that the reduction company dispose of its garbage without creating those conditions and the reduction company solemnly agreed to meet that demand. How, then, can it be permitted now to say that those con-

ditions are a necessary incident of its performance of its contract, or that they are necessarily incident to any reduction or disposal of the garbage and dead animals which it undertook to reduce? If it were in fact impossible by any reasonable precautions to dispose of that material without causing the conditions complained of, then indeed the city might possibly invoke the general police power granted it by the Legislature to justify them as a measure necessary to protect the health of its people, but when both the city and the reduction company have not only agreed that it may be disposed of without creating those conditions, but also to so dispose of it, it is not apparent how they can invoke the police power to justify the nuisance.

Nor can we agree to the proposition that the nuisance complained of is of a public nature which inflicted upon the appellants no injury different in kind from that suffered by the public generally, and that they are not for that reason entitled to an injunction restraining its continuance. Some of the acts complained of are of that nature, such as the pollution of the waters of Bodkin Creek, which prevents the complainants from boating, bathing or fishing therein. The right to boat, bathe and fish is a general and a public right belonging to the whole public in common, and the damage which the appellants have suffered through the loss of those privileges they have suffered in common with all others enjoying similar rights. But the other acts affect the appellants in a different manner from the general public. The offensive and sickening stenches, the noxious and irritating fumes, vapors, smoke and dust, the clouds of flies depositing maggots on food, which sicken the appellants while in the lawful and accustomed use of their fixed and permanent abiding places and prevent the comfortable enjoyment of their properties, and the deposit of slime and grease on the shores of those owning land on Bodkin Creek, necessarily affect them differently and injure them more than they do the general public. The mere fact that a nuisance injures one hundred instead of one, does not pre-

vent it from being a private nuisance, because one hundred does not constitute the public any more than does one, but the test is whether the damage of which the appellants complain is different in kind from that suffered by the general public, and in our opinion it cannot be said that conditions which prevent individuals from eating, sleeping or living in comfort in their own homes, and which substantially lessen the value of their properties, do not affect them differently from the general public. *Woodyear v. Schaefer,* 57 Md. 10; *Hamilton v. Whitridge,* 11 Md. 128.

So far we have dealt mainly with the complaint against the reduction company, but much of what has been said in reference to the facts involved in that case is also applicable to the complaint against the city for the manner in which it transports the material to the reduction plant. That the conditions complained of constitute an unwholesome, dangerous and offensive nuisance is obvious, and that it is unnecessary as well as dangerous in the opinion of the city authorities appears from those provisions in the specifications which are part of the contract referred to in the bill, and which require the contractor to cover all scows and receptacles used for the transportation of garbage and dead animals so as to completely inclose the material transported. To transport it in such a manner as to create the conditions complained of, when by the exercise of the same degree of care which it required of its contractor it could have prevented them, is at least *prima facie* evidence of negligence. Conceding that the Legislature has authorized the city to transport its garbage to Spit Point or any other location where in its judgment a due regard for the public health and welfare requires it to carry it, that authority does not empower it to unnecessarily injure innocent persons or unoffending property by the manner in which it exercises it. While the Legislature under the police power may legalize what would otherwise be a public nuisance, it can only do so when such action is necessary to protect the public health or welfare, and certainly, in the absence of the most explicit expression

of its intention, it will not be presumed to have legalized a
nuisance due not to necessity, but to negligence. *Baltimore
City v. Fairfield Improvement Company,* 87 Md. 360, etc.

From what has been said it is apparent that, in our opin-
ion, the facts alleged in the bill are sufficient to entitle the
plaintiffs to the relief prayed in its first, second and third
prayers for relief, and to so much of the relief asked in
the fourth prayer as relates to the deposit of oil and slime
on appellants' shores, if the pleadings are in form sufficient
to authorize the court to take cognizance of their complaint.

We have already indicated that in our opinion the plead-
ings are fatally defective. The first and most glaring defect
is that the amended bill is multifarious. It joins two wholly
distinct and independent wrongs produced by different per-
sons having, with respect to such wrongs, no necessary con-
nection with each other. That is, it alleges that the city
creates a nuisance by the negligent manner in which it trans-
ports the material, and the reduction company by the negli-
gent manner in which it reduces it. The reduction com-
pany has nothing to do with transporting the material, and
the city takes no part in the physical act of reducing it,
although it may insist that the reduction company comply
with the terms of its contract in disposing of it, but we do
not think its failure to take such action makes it a joint tort
feasor with the reduction company in the nuisance which
that company commits in the manner in which it reduces the
material. The bill therefore joins two separate and distinct
causes of action and is for that reason bad.

The objection that the amended bill is multifarious for
a misjoinder of parties plaintiff was not pressed in this
Court, and it is sufficient to say that we see no reason for
differing from the conclusion reached by the trial court,
which was that that objection was not in itself sufficient to
justify the court in holding the bill defective.

Nor do we feel that the objection that the bill is defective
because necessary exhibits were not filed with it is tenable.
That objection rests upon the fact that the complainants did

not file with the bill their muniments of title. But the title to land was not necessarily involved, since the complainants were, if they were entitled to relief at all, entitled to relief as mere residents of the territory affected by the alleged nuisance, and there was no necessity for them to prove their titles to their properties to entitle them to relief. It is true they claim that the alleged nuisance lessened the value of their property, but they charged other damages which entitled them to relief as mere residents of the neighborhood.

The objection that the bill was not properly verified is more substantial. As we have pointed out, the first, third, fourth, twelfth and fourteenth paragraphs of the amended bill are not verified at all, because the statements of the affiants that the averments in those paragraphs are true to the best of their knowledge, information and belief mean nothing, since they expressly state in the affidavits that they have no knowledge of the facts alleged in those paragraphs. The facts averred in them are material and essential parts of the appellants' case, and under the general rule should have been verified. That rule and the reasons for it are very clearly stated in *Fowble v. Kemp,* 92 Md. 639, in which the Court said: "The general rule with regard to the verification of a bill of complaint praying for an injunction is thus stated in *Union Bank v. Poultney,* 8 G. & J. 332; *Nusbaum v. Stein,* 12 Md. 318; *Mahaney v. Lazier,* 16 Md. 73: 'To warrant a court of equity in issuing an injunction, strong *prima facie* evidence of the facts on which the complainant's equity rests must be presented to the court to induce its action.' This *prima facie* evidence may consist of the oath of the plaintiff or of a third party if he knows the facts, or of documentary evidence. Such verification of the averments of the bill is required in addition to the sufficiency of the allegations, so that the confidence of the court may be obtained. Usually the affidavit is made by the plaintiff, *Salmon v. Clagett,* 3 Bland, 125; but by whomever made it should be made by some one who is acquainted with the facts. When the bill is filed by a corporation an officer

thereof or other person who has personal knowledge of the facts should swear to them. *Youngblood v. Schamp,* 15 N. J. Eq. 42. The verification must extend to all the material facts upon which a right to the injunction rests and must be direct and positive."

The appellees also contend that it appears from the bill that the appellants have an adequate and complete remedy at law, and that for that reason they are not entitled to relief in a court of equity, but we do not agree with that proposition. It is true that they could bring an action at law for such damages, if any, as they may have suffered as a result of the alleged nuisance, and that they could perhaps have applied to the State Board of Health for its abatement. But those remedies are obviously insufficient to meet such a case as this. The appellants might in an action at law be sufficiently compensated for any depreciation in the value of their property, but it would be difficult if not impracticable for them to recover definite and adequate compensation for such intangible injuries as loss of sleep, nausea or even for the impairment of their health. Such damages would be hard to prove and harder to measure. *Woodyear v. Schaefer,* 57 Md. 1. Nor can they be required to endure the discomforts of which they complain until the State Board of Health shall have investigated the supposed nuisance, and have acted in reference thereto.

The remedy by injunction is certain, prompt and efficacious, and there is no apparent reason why the appellants should not be entitled to it merely because the State Board of Health may also apply for an injunction or take other steps to abate the nuisance. It has not been supposed that the creation of that body affected the usual and ordinary jurisdiction of courts of equity, nor that the power of courts of equity to grant relief in such cases as this has been diminished by the powers granted to that board.

Nor do we think that there is any merit in the defense of laches. 20 *R. C. L.* 497, etc. In *Woodyear v. Schaefer, supra,* in dealing with that defense upon the facts of that

case the court said: "But the wrong complained of, and disclosed by the evidence, amounts to a public nuisance, for which there can be no prescription. *Wood on Nuisances,* sec. 724; *Commonw. v. Upton,* 6 Gray, 473; *Mills v. Hall,* 5 Wend. 315. But the appellee's slaughter-house was not erected until about 1874, and the pollution of the stream did not give any trouble of material importance until about eight years ago, since which time it has been gradually growing worse. It was natural for the complainant to bear evil as long as it was slight, rather than engage in a tedious and expensive litigation. He could not be expected to sue until his right was materially interfered with. *Crosby v. Bessey,* 49 Me. 539. If he had complained sooner he might have been unable to make out a case of such interference with the reasonable enjoyment of his property as would have entitled him to the aid of a court of equity. Until he received some substantial injury he could not be expected to sue, and so there could be no prescription as against his right to the free user of the water, until that right was interfered with for the purpose for which he used it, and then only to the extent of that interference."

It follows from what has been said that, in the opinion of this Court, (1) the demurrer to the amended bill of complaint was properly sustained, first, because it joined two independent and unrelated causes of action, and, second, because it was not sufficiently verified; and (2) the facts alleged in the bill are sufficient in a proper proceeding to entitle the complainants to a part of the relief prayed. But the decree appealed from dismissed the bill "without prejudice" to the "rights at law" of the complainants. In that form the decree precludes the complainants from seeking relief in a court of equity, and is to that extent erroneous, since the amended bill should have been dismissed "without prejudice," without any limitation whatever upon the complainants' remedies. 21 *C. J.* 451; *Fowler v. Osgood,* 141 Fed. 20, 4 *L. R. A., N. S.* 830. The decree will therefore be reversed and the cause remanded that a decree may be

entered in conformity with the views expressed in this opinion.

> *Decree reversed and cause remanded that a decree may be entered in conformity with the views expressed in this opinion, with costs to the appellants.*