The Danbury and Norwalk Railroad Company *vs.* The Town of Norwalk.

A railroad was carried through a densely populated village by a deep cut running under the principal street, which crossed it by a bridge, the station being located on the side of the street and supported by the walls of the excavation. The town undertook to construct a drain, which was to discharge the water of the street into the cut under the bridge, to the injury of the wall and the railroad. The railroad in its location and construction intercepted the natural course of the drainage of the locality, and it was indispensable that a drain be constructed for the street, but it appeared that, at a greater but not unreasonable expense, one could be constructed that would not injure the railroad company. Held that the town ought to be enjoined against the construction of the drain in the manner proposed.

PETITION for an injunction, brought to the Superior Court in Fairfield County.

The petition alleged " that a portion of the petitioners' railroad was made by excavating through a solid rock, to the depth of about twenty feet, under a certain highway in said town of Norwalk ; that on said highway the petitioners have a passenger depot, to and from which a large number of passengers leave and return daily by the various trains run on said railroad ; that said town of Norwalk is now constructing a sewer or drain in and along the above mentioned highway, to the petitioners' said railroad, for the purpose of wrongfully diverting the water from the highway from the course which it has heretofore run, and which it now ought to run and would run if not so wrongfully diverted, and of turning and emptying said water in large quantities into and upon the petitioners' said railroad track, to the great inconvenience of all who have occasion to travel upon said railroad, and to the great injury of the road, by covering the same with water, rotting the ties and washing away the road-bed, and thereby endangering the lives of those who travel thereon ; that the amount of water which will be discharged by said sewer upon said railroad track, if said sewer shall be constructed as proposed, will be sufficient to flood said track, and can only be removed therefrom by passing through said passenger depot, and thence

along and upon said railroad track for more than two hundred yards; and that the petitioners cannot remove said water from said track, because the bed of their road at that place is a solid rock in which they cannot construct a sewer for said water without great expense and delay of the business of said road; all of which acts so threatened to be done and now being done are wholly unnecessary for the removal of the water from said highway, are wantonly oppressive and injurious to the petitioners, and are wholly unjustifiable"; praying for a perpetual injunction against the acts complained of.

The respondents filed an answer, alleging that they were constructing a drain in and along the highway mentioned for the purpose of carrying off to its proper outlet, the Norwalk river, the natural surface drainage of a portion of the highway contiguous to the railroad of the petitioners, and that the discharge of such drainage from such drain into the ditch of the railroad under the highway, was the necessary and rightful method of so draining the highway; that the petitioners, by the construction of their railroad, had obstructed the drainage and impaired the usefulness of the highway; that although they had made some provision for the escape of a portion of the drainage so obstructed, yet that such provision was insufficient to secure the proper drainage of the highway, or to restore it to the state of usefulness in which it was previously to the construction of the railroad; and that the respondents commenced the construction of the drain to remove the nuisance caused by the petitioners in so constructing their road.

The case was referred to a committee by whom the following facts were found:

The petitioners had a right under their charter to construct and did construct their road across Wall street, a public highway in the most populated portion of the town of Norwalk, in a northerly and southerly direction and at nearly right angles to the same, by a cut about fifteen feet deep and eighteen feet wide. The side walls of this excavation are supported by heavy stone-work laid without mortar. The station of the company at this place is a building of consider-

able size, constructed of brick, and is erected on the side walls of this excavation and upon a line with the other buildings on that side of the street. Under this building, and for a distance of about ten feet in front of it, the width of this excavation is increased some eight or ten feet by a recess in the westerly wall, in which a stairway leads down from the depot building to the platform by the side of the railroad track. This excavation is covered with plank which forms a bridge over the same, and the surface of the street through its entire width at this point. Southerly from the station the excavation is uncovered and continues through a rock excavation for a distance of about four hundred feet, where it terminates, and here the railroad track crosses Water street at its present level.

In this excavation there is an open ditch on each side extending from the upper end of the same to Water street; the one on the westerly side passing under the platform is connected with the one on the easterly side by a wooden box culvert near its terminus eight inches square, and this easterly ditch discharges into a pipe eight inches in diameter, which leads to the southerly side of Water street and turns off to its point of discharge into the river across private property under a parol license subject to be revoked at any time. These ditches were constructed in their present form when the road was built in 1852, and have been used by the company since that time without change, except so far as they have been affected by the accumulation of mud therein. They were sufficient to carry off all the water that flowed through this excavation at the time the road was built, but they are not sufficient to carry off all the water that the proposed drain would at times of unusual rains and thaws bring upon them.

The distance from the station to Water street is about four hundred feet, and from thence to the river one hundred and forty-three feet, ninety-five feet of which is over private property, but if the company cannot obtain the privilege of going over this property, then they will have to carry the water southerly from Water street about five hundred feet, where

their land lies upon the river.   The expense of constructing a sewer from the station to the river by a route entirely on the land of the petitioners, would involve an expense of about twenty-five hundred dollars.

The construction of the drain in controversy by the town of Norwalk commenced in the fall of 1866, under the direction of the proper officers of the town.   The open street gutter approaches from the west, on the southerly side of Wall street, to within about eighty feet of the railroad crossing, and is then continued underground in the line of the gutter to within about fifteen feet of the excavation, for the purpose of carrying the water accumulating on the street through the westerly wall of the excavation into the excavation and upon the sides or ditches of the railroad therein.   This drain is built of stone of sufficient dimensions to carry off the water, and had reached a depth of from twenty-one to twenty-three inches below the bottom of the street paved gutter, when its further construction was arrested by the present proceedings.

The persons employed to build this drain were directed by the town to extend this drain to within six feet of the westerly wall of the excavation, and then turn it southerly towards the north end of the recess under the depot building.   No instructions were given to make any opening in the wall, nor in what manner to complete the outlet into the excavation. To permit the water to discharge itself at or near the wall and penetrate through it into the excavation, would greatly endanger the wall and depot building.   There is but one track laid through this excavation, and the grade descends southerly at the rate of sixty-five feet to the mile from the depot to Water street.

This drain was intended to receive only the natural surface water collecting from rains and thaws on the street westerly of the crossing, and discharge them into the excavation at or near the present terminus of the drain, and to accomplish that object the surface of the ditch at the westerly end of the same was raised by the town about six inches, so as to enable the water to enter the drain, by which it is now discharged

at its present terminus near the westerly wall of the excavation and percolates through the wall in several places and in such quantities in heavy rains and thaws as to cover the track of the railroad to the depth of five or six inches for several hundred feet, to the great inconvenience and damage of the railroad.

Sixty years ago and more there was a swale extending from a northerly direction, and crossing Wall street about four hundred feet westerly of the railroad crossing, and thence passing down southerly across Water street to the river. Through this tract of low ground most of the surface water thence passed to the river. Since then, and from time to time, the sidewalk on the south side of Wall street and the street at this point have been raised by individuals, by the town, by the Danbury and Norwalk Railroad Company, and by the Norwalk Horse Railroad Company, from five to six feet, by which the passage of the water through its former course has been much impeded and to a considerable extent has been forced transversely across the street in a northeasterly direction, through the gutter on the north side of the street, and down the street into the river, about two hundred feet easterly of the present railroad crossing and above the present bridge; and this was the condition of the drainage at the time of the construction of the railroad.

At the time the Danbury and Norwalk railroad was built, the highest point in Wall street was a few feet westerly of the present crossing, declining to the north and east. A small quantity of surface water on this northeastern slope passed easterly over the point of intersection between the railroad and the street on the southerly side of the street into the river below the bridge.

The plank covering over the cut and the construction of the cut make it impracticable to extend the gutter on either side of the street across it. The drain on the northerly side of the street empties into the cut.

It is necessary for the public convenience that the water which accumulates on the southerly side of Wall street west of the railroad, and which is brought by the drain in controversy

upon the railroad track, should be removed from the street. This can be done by carrying the water through the low grounds lying westerly of the railroad and southerly of Wall street to the river, by means of a covered drain or otherwise, a distance of about two thousand feet, without producing very great damage to individuals or the public, and it can also be constructed through the western wall of the railroad at the excavation, by pipes properly constructed, into the gutters by the side of the track and thence to the river, provided the gutters should be sufficiently excavated and enlarged to carry off the water that would be discharged into them, but this would require the expenditure of considerable money to secure the railroad from inundations from extraordinary freshets.

The grade of the center of Wall street from near the railroad crossing to the rising ground on the west, was nearly level for some hundred feet, at the time of the construction of the drain.

The petitioners had no notice of the intention of the town to build this drain. The action of the town in the premises was free from wantonness or malice, unless the same can be inferred from the facts herein found.

At the time of the construction of the road by the petitioners, they raised the grade at the crossing about three feet on the northerly line of the street, gradually diminishing it to the original surface of the street on the south line of the same. The road was a few inches higher on the south side of the road, about sixteen feet westerly of the railroad, than it was at the crossing. The times when the railroad companies raised Wall street did not fully appear, but it was soon after their respective acts of incorporation. The Danbury and Norwalk Railroad Company raised the street at its lowest point about four feet; the Norwalk Horse Railroad Company about two feet. The grade of the horse railroad was fixed and agreed upon by the proper officers of the town and the company. There was no vote of the town, nor any direct action of its officers, authorizing or approving of the grade to which the Danbury and Norwalk Railroad Company raised Wall street, but it was publicly done in the most cen-

tral portion of the town and on its greatest thoroughfare, and attracted the attention of the officers of the town, and the public generally living in the town, and was done without objection from any one. It is therefore found that the petitioners raised the grade of Wall street with the approbation and consent of the town of Norwalk, if such approbation and consent can be inferred from the foregoing facts.

Upon these facts the case was reserved for the advice of this court.

*Beardsley* and *L. Warner, Jr.*, for the petitioners.

1. The facts found do not amount to a justification of the acts of the respondents. The acts done by the petitioners did not create a nuisance. They were done with the consent of the town, and, if not with their consent, they have since ratified and approved of them. If we have created a nuisance or impaired the usefulness of the highway, they have ample remedy.

2. The facts show that it is not necessary to drain the street in this direction. It is not the course of the surface drainage. It is not less expensive to the public or less burdensome to individuals. But if necessary, this drain was unnecessarily injurious to us, because not properly constructed. The power of towns over highways is not arbitrary. The only warrant for their action is found in the public necessity.

3. Where towns have discretionary powers, courts of equity have power to restrain them by injunction, and courts of law may punish them where they have acted improperly. *Perry* v. *City of Worcester*, 6 Gray, 544; *Sprague* v. *City of Worcester*, 13 Gray, 193; *Thayer* v. *City of Boston*, 19 Pick., 516; *Goodloe* v. *City of Cincinnati*, 4 Ohio, 518; *Humes* v. *Mayor &c. of Knoxville*, 1 Humph., 403, 414; *Rochester White Lead Co.* v. *City of Rochester*, 3 Comst., 466; *Lloyd* v. *Mayor &c. of New York*, 1 Selden, 374; *People* v. *Sturtevant*, 9 N. York, 263.

4. Power to drain this highway was in the borough of Norwalk. The town had no authority in the premises. 3 Private Acts, 243.

5. If the town had any power in the premises, it was by virtue of an act passed in the year 1866. Private Acts of 1866, p. 227. This act provides for the construction of sewers, and the act must be complied with or there can be no justification under it. *Mayor &c. of New York* v. *Furze*, 3 Hill, 612.

*Smith* and *Wilson*, for the respondents.

The proposed drain is not a sewer, but will receive " only the natural surface water collecting from rains and thaws and accumulating on the street west of the crossing," which drainage has no present outlet, and which " it is necessary for the public convenience should be removed from the street." This drain is to be entirely within the limits of the street. The right of the town to build such a drain is based on its general authority to construct drains in any part of the street in pursuance of its statutory duty to repair it. *Cone* v. *City of Hartford*, 28 Conn., 363 ; *Commonwealth* v. *King*, 13 Met., 118. And on the additional fact that the operations of the petitioners on this street have alone made a drain necessary in place of an open street gutter. If the petitioners claim to have deprived the town of its original right to lay a drain on any part of this street for the convenience of the public travel, they must show affirmatively and clearly when and how. Such result does not necessarily follow the company's right to lay and use a track across the street. If it arises from the particular method used in crossing, the right to such precise method must be shown. *Foote* v. *N. Haven & Northampton Co.*, 23 Conn., 229.

The railroad was constructed in 1852. The charter of the company was in 1850 conformed in all respects to the general railroad law of 1849. By sections 12 and 13 of that enactment it was the duty of this company to restore any street crossed by them " to its former state, or in sufficient manner not to impair its usefulness." The company is authorized to " change or alter" a street only when " the railroad cannot be judiciously laid out and constructed across or upon the same without interfering therewith ;" and even then only " by and with the advice and consent of the commissioners."

None of these conditions are shown to have been complied with by the petitioners, and there are neither legal nor natural presumptions to supply the absence of proof. The legal principle, that after a great lapse of time all things will be presumed to have been properly done, cannot apply here, for the time, 14 years, is much too short. *Fowler* v. *Savage*, 3 Conn., 96; *Watrous* v. *Southworth*, 5 id., 309. No length of time will legalize a public nuisance. *Hamden* v. *New Haven & Northampton Co.*, 27 Conn., 169; *Commonwealth* v. *Upton*, 6 Gray, 476.

It is affirmatively shown that the petitioners failed to restore this street to its former state of repair. They found the street practically graded and drained eastwardly, along its length, over the point selected for their crossing, directly to the river, 200 feet distant. They stopped this easterly escape of the drainage, and it has never since crossed the line of their excavation. They have substituted nothing. We are told that they made ditches in their cut which " were sufficient to carry off all the water that flowed through the cut at the time the road was built," but it does not appear that the drainage of this street was ever allowed to enter the cut; and they now ask the court to decree that it never shall.

The peculiar construction of this crossing, being unauthorized by the petitioners' charter, was a public nuisance, making it physically impossible perhaps to get the street drainage over the crossing, but not impairing the town's right to bring it as far as the crossing. For the arrangement which caused the railroad to intercept and receive the street drainage the town was in no way responsible. The report finds virtually that the town had no other means of draining the street, and that its action was free from wantonness or malice. An owner in fee could not prevent the draining of the street by putting a vault in the way of its gutters, much less this railroad company. But assume all things to have been properly done when the crossing was built, and that the " natural surface drainage" which they now object to providing for, is a subsequent increase. It is inevitable in all growing places, and still the duty of the railroad company to accommodate it.

*Commonwealth* v. *New Bedford Bridge*, 2 Gray, 339. The use of highways for drainage is a substantial right belonging to towns independently of their use as avenues of travel. This right was especially valuable on Wall street, from its central position and direct connection with the river. *Codman* v. *Evans*, 5 Allen, 308 ; Angell on Highways, § 25.

The report finds that the company can accommodate all the obstructed drainage by a plan involving no injury or risk to their road, even in extraordinary freshets, viz., a sewer 900 feet long if built entirely on their own land ; 543 feet long if they obtain a right of way through 95 feet of private property ; and possibly but 143 feet long if the experiment be tried of cleaning the accumulation of mud out of their present ditches. Some drainage facilities must always be maintained by the company throughout the entire length of their road, and the servitude of such sewer would in no way injure it. The expense is estimated at about $2,500. If on the other hand the town is obliged to supply the new accommodation required, it must carry the water " by covered drain or otherwise, a distance of about 2000 feet," and of necessity through private property. Such a servitude would seriously impair the value of this property for building purposes. If the town owns no such right, it could purchase it only at a heavy cost, and perhaps not at all. If it does own it, the equities of the land owners against its exercise are greater than of the railroad to compel it. Future buildings and enclosures would make the repair of such drain more difficult and expensive than of the sewer along the open railroad, while its original cost would be much greater.

PHELPS, J. The practical question presented in this case is, whether the town of Norwalk, for the purpose of the necessary drainage of one of its highways, can rightfully construct a sewer to terminate and discharge its contents at, or so near to, the rear of the excavation wall of the Danbury and Norwalk Railroad Company, which supports its depot in the borough of Norwalk, as to seriously endanger the safety of the wall and depot.

The consequences to the petitioner of the respondent's contemplated act are not denied, and are sought to be justified under the general statutory authority and duty given to, and imposed upon towns, to maintain their highways in a proper condition; and also on the ground that the petitioner, in the original construction of its railroad at the place of the excavation, intercepted the natural and accustomed course of the drainage of that locality, and thereby rendered necessary the establishment of the projected sewer.

Upon the general question of the authority and duty of towns with respect to the proper maintenance of their highways, there is no opportunity for controversy. The authority is clear, and the duty imperative; always subject however to the salutary qualification, interposed for the protection of others, that this authority shall be so exercised, and this duty discharged in such a manner, as to occasion no wanton injury to the property or rights of other persons, natural or artificial.

The question whether such a corporation as the respondent, in consequence of any immunity inherent in its municipal character, is exempt from those liabilities for malfeasance for which individuals and private corporations would be liable in a civil action by the party injured, is no longer an open one. The acts, of the character of those now in question, involved in the necessary performance of a duty prescribed by a municipal ordinance, are strictly ministerial, and when performed by an officer or agent by direction and for the benefit of the corporation, no exemption from liability by the principal can be interposed when from negligence or wilfulness they are so performed as to produce unnecessary damage to other parties. *Perry* v. *City of Worcester*, 6 Gray, 544; *Sprague* v. *City of Worcester*, 13 id., 193; *Rochester White Lead Co.*, v. *City of Rochester*, 3 Comstock, 464; *Mayor &c. of New York* v. *Bailey*, 2 Denio, 433; *Mayor &c. of New York* v. *Furze*, 3 Hill, 612; *McCombs* v. *The Town Council of Akron*, 15 Ohio, 476.

The finding discloses that the excavation is fifteen feet deep at the crossing of the highway and is continued south-

erly therefrom four hundred feet through rock,—that the depot building is of brick, erected upon the side walls of the excavation,—that the respondent designed to discharge the contents of the drain into the excavation,—that it directed its workmen to extend it to a point within six feet of the rear of the westerly wall thereof, and then turn it southerly parallel therewith towards the north end of the recess under the depot building, with no instructions to provide an artificial passage through the wall. It is also found that to permit the water from the drain to so discharge itself at or near the wall and penetrate through it into the excavation, will greatly endanger the wall and depot building, and that the water from the drain as it now is, percolates through the wall in several places, and to such an extent in times of heavy rains and thaws as to flood the railroad track of the petitioner,—that the petitioner's ditches in the excavation will be insufficient to carry off the water which the drain, if completed, will at times discharge into them, and that the respondent can with additional expense so construct the drain as not to subject the petitioner to damage.

The expense of its construction is proper to be considered as an element materially qualifying the obligation of the respondent, but it is conceded that the proposed drainage is necessary to the proper condition of one of the principal streets in a large and densely populated village, and the amount required for the proper construction of the drain in such a manner as not to injure the petitioner is not found to be reasonably sufficient to seriously affect the extent of the respondent's obligation; and we think the facts above recited clearly justify the inference that the respondent's conduct was characterized by an appearance of wantonness entirely irreconcileable with a reasonable consideration for the property and established rights of the petitioner.

The general power of a court of equity with respect to its authority to intervene for the summary protection of a party threatened with injury by the wrongful act of another cannot be questioned, and the propriety of its exercise is not invariably limited to cases in which there is no adequate legal rem-

edy. Its preventive authority may be, and frequently is, invoked and exercised in cases where apparently adequate legal redress for the menaced wrong might after its infliction probably be obtained; but it is a part of the wholesome policy of the law in its application to causes in this forum, to prevent an injury as well as to redress one, especially when the circumstances indicate essential wrong to the aggrieved party, which in its consequences is also likely to injuriously affect the public. Theoretically, as a general rule, chancery may not assume to exercise jurisdiction when there is adequate remedy at law. It does so practically, in numerous cases where the completeness of the legal remedy is disputed or doubtful; and sometimes also irrespective of that consideration, when it is manifestly better to prevent the perpetration of a wrong which will be not only highly prejudicial to the party immediately threatened, but also directly or incidentally detrimental to the public.

With reference to the other branch of the respondent's claim, it appears that at the excavation the petitioner's railroad crosses the highway nearly at a right angle, and that a plank bridge over the same forms at that point the surface of the highway. On the south side of the highway and westerly from the crossing and excavation, the respondents constructed the drain, commencing at the west end and leading it to the excavation, which is parallel with and on the west side of Norwalk river, the natural outlet of the drainage of that portion of the highway. Sixty years ago, a swale extended from a northerly direction across the highway about four hundred feet westerly of the excavation, thence passing southerly to the river, and through this most of the surface water passed. Since then, and from time to time, the highway at the excavation has been raised by individuals, by the Norwalk Horse Railroad Company, by the petitioner, and by the respondent, in all from five to six feet, by means of which the passage of the water through its former course has been much impeded, and it has to a considerable extent been forced across the highway in a northeasterly direction and down the northerly side of the highway to the river, and this was the condi-

tion of the drainage when the petitioner constructed its railroad. The grade of the Norwalk horse railroad, where it crosses the highway, was agreed upon by the respondent and the company, and the grade to which the petitioner raised the highway at the excavation was well known to, and without objection from the respondent, and acquiesced in by it, since 1852.

In view of these facts we think, if the respondent's claim has any valid foundation, it is entirely insufficient against the prevailing equity existing in favor of the petitioner.

We have not considered the point made by the petitioner that the duty to maintain the highway in question was in the borough of Norwalk, and therefore not in the respondent, for the reason that in our view of the case it is unnecessary; and if otherwise, the charter and by-laws of the borough, referred to in the briefs of counsel, were not printed with the record, or produced or read in the argument of the cause.

We advise the Superior Court that the petitioner's injunction should be made perpetual.

In this opinion the other judges concurred; Judge GRANGER of the Superior Court sitting in the place of Judge BUTLER, who was disqualified by interest as an inhabitant of Norwalk.