[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON PLAINTIFF'S APPLICATION FOR TEMPORARY INJUNCTION AND BLANCHETTE DEFENDANTS' MOTION FOR DISCHARGE OF NOTICE OF LIS PENDENS
Pursuant to a June 26, 1998, application, and affidavit in support, plaintiff moves for a temporary injunction in this case. Pursuant to an October 2, 1998, motion, defendants Blanchette Builders and Donna Blanchette seek; an order discharging a notice of lis pendens, dated September 22, 1998, and recorded on or about that date.
The court held a hearing on November 6, 10 and 12, 1998 on these pending matters. Subsequently, briefs and responsive briefs were filed. This decision is based on a review of the full record, including the briefs, relevant authorities, the hearing exhibits, notes, a view of the subject properties, transcripts of two days of the hearing, and oral argument following the hearing and again on January 19, 1999.[1]
The Complaint
The complaint in this case states as follows:
FIRST COUNT:
1. The Plaintiff, a resident of the Town of Suffield, County of Hartford and State of Connecticut, is the owner in fee simple of certain pieces or parcels of land located in the easterly side of East Street and the rear thereof in said town. Said parcel is approximately 62 acres of land. CT Page 1126
 2. The Defendants are the owners in fee simple of several pieces or parcels of land on the easterly side of East Street Estates in said town, known as Lots 1, 2, 3, 4, 5, 6, 7 and 8 and open spaces, all on a map entitled "Final Subdivision Plan East Street Associates Prepared for Blanchette Builders, Inc., Suffield," which map is on file with the Town Clerk's office of the Town of Suffield.
 3. The Defendant, Town of Suffield, acting through its Inland Wetlands Commission, Planning Zoning Commission and Town Engineer, have authorized the Defendant, Blanchette, to construct single family houses and/or other action and thereby directing water through a certain D.O.T. Pipe to a street-water easement onto Plaintiffs' property.
 4. The pieces or parcels of land owned by the Defendants are easterly of East Street in the Town of Suffield and are generally westerly of Plaintiff's parcel.
 5. The Defendant, Blanchette Builders, is the owner of Lots 1-8 of the subdivision (hereinafter D. Blanchette) are each one-eight (1/8) owners of the open spaces and responsible for the drainage facilities of the subdivision.
 6. On diverse dates after January 15, 1998, the Defendant, Blanchette Builders, Inc., (hereinafter Blanchette) deposited quantities of fill on its land in preparation for the construction of single family homes thereon and further constructed a paved roadway, single family homes with roof drainage collection systems and paved driveways. The actions of Blanchette, changed the natural contour and topography of said land and raised parts of it to an elevation higher than it had been and collected and directed water on the land into drainage systems on said property.
 7. As a result of the aforedescribed actions, surface and subsurface water which formerly remained on the property of the Defendants or occasionally flowed after storms and in seasonal flows in a northerly direction were no longer allowed to follow its natural course and is instead substantially increased in amount and flow and is redirected and funneled onto the Plaintiff's property.
8. On diverse days after January 15, 1998 Defendant CT Page 1127 wrongfully and artificially has created with the use of machinery and equipment and maintained thereafter drainage ditches and channels on the East Street Estates which serve to collect and channel surface, subsurface and storm waters from a large area including both land owned by Blanchette and by others.
 9. The Defendant failed to comply with building permits and local and State environmental properties laws by failing to install sedimentation and erosion controls prior to initiating its construction activities and, thereafter, failing to properly install and maintain sedimentation and erosion controls; which actions have caused sedimentation to travel onto Plaintiff's property causing damage to Plaintiff's land.
 10. The subsurface, surface and storm waters so collected in such drainage ditches and channels are no longer allowed to follow their natural course and to be absorbed into the ground but are substantially increased and directed onto the Plaintiff's property through a State of Connecticut street water pipe.
 11. As a result of the actions of Defendant Blanchette, the plaintiff has suffered the effects of the increased volume of surface waters and peak rates of flow which renders the Plaintiff's land unusable for agricultural and other uses.
 12. The Plaintiff is experiencing damage to his property as a result of the increase in volume and flow of water from Defendant's property to Plaintiff's property.
 13. As a further result of the Defendant Blanchette's actions as afore described, substantial amounts of surface, subsurface and storm water will be wrongfully and artificially collected and then diverted onto the Plaintiff's land in a manner substantially different in volume and course from its natural flow and has interfered with the peaceful and beneficial use of the Plaintiff's land, is undermining the Plaintiff's land requiring abandonment by the Plaintiff of the prime agricultural use of the land of the Plaintiff, all to the Plaintiff s great financial harm and detriment.
14. The Defendant Blanchette has refused to desist from its course of action or to employ other means on Defendants' CT Page 1128 land to prevent the damage to the Plaintiff's property.
SECOND COUNT:
 1. Paragraphs 1 through 14 of the First Count are hereby made Paragraphs 1 through 14 of the Second Count as if fully set forth herein.
 15. The adverse and harmful conditions as afore described created by Blanchette and allowed to continue to date by the Defendants constitutes a nuisance, the continuation of which will cause Plaintiff irreparable injury for which they have or will have no adequate remedy of law.
WHEREFORE, the Plaintiff claims:
1. Just and adequate money damages.
 2. A temporary and permanent injunction requiring the Defendants to cease, desist and terminate the nuisance created by it and to restore the natural flow of subsurface, surface and storm water on the property of the Defendant or to create other methods to store and impound such waters to prevent further damage to the property of the Plaintiff.
3. Such other relief as in law or equity may pertain.
Lis Pendens
Under Connecticut law, the plaintiffs bear the burden of establishing that there is probable cause to sustain the claim upon which their filing of the lis pendens is based. General Statutes Section 52-325b(a). As our Appellate Court stated inSanstrom v. Strickland. 11 Conn. App. 211, 212 (1.987), discussing the probable cause hearing and the standards for the maintenance of a lis pendens:
At such a hearing, the plaintiff is initially required to establish probable cause to sustain the validity of his claims. General Statutes 52-325b (a); see e.g. Stratton v. Ward, 39 Conn. Sup. 195, 474 A.2d 113 (1983). This probable cause hearing is not a trial on the merits, nor is it intended as such. The plaintiff need not establish his claim by a preponderance of the evidence. The court, while not making a final decision on the merits, weighs the testimony CT Page 1129 given and the documentary proof presented. The trial court's duty is to weigh the probabilities based on the facts and to exercise its broad discretion in determining whether there is probable cause to sustain the lis pendens. Williams v. Bartlett, 189 Conn. 471, 483, 457 A.2d 290 (1983); Michael-Papa Associates v. Julian, 178 Conn. 446, 447, 423 A.2d 105 (1979); Cavallo v. Lewis, 1 Conn. App. 519, 520, 473 A.2d 338 (1984). Probable cause is a flexible, common sense standard. Wall v. Toomey, 52 Conn. 35, 36 (1884).
General Statutes § 52-325 et seq. are the relevant provisions of law which must be initially considered. Section 52-325 provides that a party may cause to be recorded a notice of lis pendens in any action "intended to affect real property." Section 52-235 (b) states that an action "intended to affect real property" means:
 (1) actions whose object and purpose is to determine the title or rights of the parties in, to, under or over some particular real property;
 (2) actions whose object and purpose is to establish or enforce previously acquired interests in real property;
 (3) actions which may affect in any manner the title to or interest in real property, notwithstanding the main purpose of the action may be other than to affect the title of such real property.
As noted in Stratton v. Ward, 39 Conn. Sup. 195, 197 (1983), the language of subsection (b)(3) is extremely broad. Section (b)(1) defines actions "intended to affect real property" to include actions whose "object and purpose" is to determine the title or rights of the parties in, to, under, or over some particular real property. As the plain language indicates, the focus of (b)(1) is the "object and purpose" of the action, not the likelihood of success. The same is true as to section (b)(2). Section (b)(3) defines actions "intended to affect real property" very broadly to include actions which "may affect in any manner the title to or interest in real property, notwithstanding that the main purpose of the action may be other than to affect the title of such real property." General Statutes Section 1-1
provides that words and phrases are to be given their ordinary meaning in construing statutes. Here, the language of the statute is plain and unambiguous in its unusual breadth. State v. Trent, CT Page 1130182 Conn. 595, 599-600 (1981); Ratick v. Scalo, 165 Conn. 675,677-78 (1974).
Notwithstanding the broad and inclusive language of the statute, I conclude, in consideration of the full record, that the motion to discharge should be granted. Merely because the Blanchette properties are alleged to have contributed to the problem alleged does not transform this into an action affecting the title to or interest in the property itself. Cf. Garcia v.Brooks Street Association, 209 Conn. 15, 22 (1988) ("From the face of the statute it is clear that a notice of lis pendens is appropriate only where the pending action will in some way, either directly or indirectly, affect the title to or interest in the real property itself."); Quail Run Village v. Benedetto, (Arena, J, March 10, 1992) (actions which seek solely monetary damages do not affect title to property and should not be viewed as affecting title to property under the lis pendens statute). I agree with defendants' argument, see page 25 of Defendant Blanchette Builders, Inc. and Donna Blanchette's, December 11, 1998, Post-Hearing Brief, that mere ownership of a lot within the subdivision does not give the plaintiffs a cause of action directly or indirectly affecting the title to, or interest in, the subject property, as to the defendants or any future owners. The issuance of injunctive relief, or money damages following trial, would not alter this fact. Nor would the possibility of future litigation against individual lot owners, in connection with future problems. The motion to discharge is therefore granted.
Temporary Injunction
Decision on the application for temporary injunction requires a brief discussion of governing legal principles relating to the standards for granting injunctive relief; the elements of a nuisance claim; and legal principles relating to the dispute at hand.
Standards for Injunctive Relief
The general requirements for the issuance of injunctive relief are well-known, but they are worth recountiny. They are set out in Berin v. Olsen. 183 Conn. 337, 340-343 (1981), in which Justice Healey wrote as follows in upholding the trial court's granting of injunctive relief: CT Page 1131
 We have repeatedly held that the issuance of an injunction rests in the sound discretion of the trial court. O'Neill v. Carolina Freight Carriers Corporation, 156 Conn. 613, 618, 244 A.2d 372 (1968); Taylor v. Conti, 149 Conn. 174, 181, 177 A.2d 670 (1962); Adams v. Greenwich Water Co., 138 Conn. 205, 83 A.2d 177 (1951). "A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law." Hartford v. American Arbitration Assn., 174 Conn. 472, 476, 391 A.2d 137 (1978); see Town of Waterford v. Grabner, 155 Conn. 431, 232 A.2d 481 (1967); Theurkauf v. Miller, 153 Conn. 159, 161, 214 A.2d 834 (1965); Stapleton v. Lombardo, 151 Conn. 414, 416, 198 A.2d 697 (1964) . . . We have stated that: "[W]hether damages are to be viewed by a court of equity as irreparable' or not depends more upon the nature of the right which is injuriously affected than upon the pecuniary loss suffered. Robertson v. Lewie 77 Conn. 345, 346, 59 A. 409 [1904]; Danburg Norwalk R. R. Co. v. Town of Norwalk, 37 Conn. 109, 120 [1870]; Sisters of St. Joseph Corporation v. Atlas Sand, G. S. Co., 120 Conn. 168, 176, 180 A. 303 [1935]." Burroughs Wellcome Co. v. Johnson Wholesale Perfume Co., 128 Conn. 596, 604-605, 24 A.2d 841 (1942). . . . "A remedy at law, to exclude equity jurisdiction, must be as complete and beneficial as the relief in equity." Beach v. Beach Hotel Corporation, 117 Conn. 445, 453, 168 A. 785 (1933); Winestine v. Rose Cloak Suit Co., 93 Conn. 633, 638, 107 A. 500
(1919) . . . Defendants next claim that the court erred in granting the injunctive relief since the equities of the case do not balance in favor of the plaintiff. This court has noted that although the granting of an injunction rests within the sound discretion of the trial court," [i]n exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction." Moore v. Serafin, 163 Conn. 1, 6, 301 A.2d 238 (1972), and cases cited therein. "The relief granted must be compatible with the equities of the case. Moore v. Serafin, 163 Conn. 1, 5, 301 A.2d 238 [1972]; Gerald Park Improvement Assn. Inc. v. Bini, 138 Conn. 232, 236, 83 A.2d 195 [1951]." Dupuis v. Submarine Base Credit Union. Inc., 170 Conn. 344, 356, 365 A.2d 1093
(1976).
See also Sisters of St. Joseph Corp. v. Atlas Sand,120 Conn. 168 (1935) (injunction may be issued to abate continuing nuisance such as the interference with water rights, or the right of CT Page 1132 lateral support, or overflowing of land due to the nature of the injury;); Ferri v. Pyramid Construction Co., 186 Conn. 682, 687
(1982) (with respect to the requirement that a plaintiff prove proximate cause, under the substantial factor doctrine, trial court could accept plaintiff's evidence of causation without requiring that the defendant's alternative theories be expressly and entirely discredited.); Coburn v. Lenox Homes. Inc.,186 Conn. 370, 383 (1982) (more than one proximate cause may result in any harm suffered; proximate cause results from a sequence of events unbroken by a superseding cause.)
As numerous cases have pointed out, a temporary injunction does not determine the merits of the case, but simply preserves the status quo pending a full adjudication. 43 C.J.S. Injunctions
Section 5.
It is important to remember that the standard for the issuance of an injunction is not the less demanding "probable cause" standard which applies to a lis pendens. Rather, injunctive relief should not be granted unless there is "either a likelihood of success on the merits or a sufficiently serious question going to the merits of the claim as to make it a fair ground for litigation plus a balance of hardships that tips decidedly in favor of the moving party." Malkentzos v. DeBuono,102 F.3d 50, 54 (2d Cir 1996); Waterbury Teachers Association v.Freedom of Information Commision, 230 Conn. 441, 446 (1994).[2]
The issuance of an injunction is discretionary, and is a harsh remedy." Stocker v. City of Waterbury, 154 Conn. 446, 449
(1967). The power of courts to issue preliminary injunctions should be exercised with the utmost care and great deliberation. See 43 C.J.S. Injunctions Section 14-15. Even where the danger of irreparable injury has been shown, the granting of injunctive relief is not mandatory. It remains a matter committed to the sound discretion of the court. Emhart Industries. Inc. v.Amalgamated Local Union 376. U.A.W., 190 Conn. 371, 406 (1983);Berin v. Olson, 183 Conn. 337, 340 (1981). Generally, a temporary injunction will not issue unless the evidence is clear and no substantial doubt exists as to the plaintiff s right to it.Letko-Shave Corp. v. General Shaver Corp. , 19 F. Sup. 843
(D. Conn. 1937).
Moreover, as has been noted, an injunction will not be issued to remedy a past harm, but will be issued only to prevent an ongoing or future anticipated harm. If the damage has already occurred, money damages, not injunctive relief, provides the CT Page 1133 proper remedy, see 43 C.J.S. Injunctions Section 22, unless the problem is a recurring one.
Elements of a Nuisance Claim
As noted, plaintiffs allege that defendants have created a nuisance. The elements of a nuisance are as follows, as set out in Dingwell v. Town of Litchfield, 4 Conn. App. 621, 624 (1985):
 A nuisance has been described as a condition, the natural tendency of which is to create danger and inflict injury upon person or property. Kostyal v. Cass, 163 Conn. 92, 99, 302 A.2d 121 (1972); Wright Fitzgerald, Conn. Law of Torts 128, p. 288. "To establish a nuisance four elements must be proven: (1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; (4) the existence of the nuisance was the proximate cause of the plaintiffs' injuries and damages." Filisko v. Bridgeport Hydraulic Co., 176 Conn. 33, 35-36, 404 A.2d 889 (1978). These elements are required in a nuisance action against a town as well as against a private individual. Id., 35-37; DeLahunta v. Waterbury, supra, 634-35. Whether these elements exist is a question of fact. Filisko v. Bridgeport Hydraulic Co., supra, 36; Marchitto v. West Haven, supra, 437.
Cases Relating to Surface Water
The parties have cited numerous cases relating to the rights and obligations of parties in situations similar to the instant one. An abbreviated review of fundamental principles set out in these cases is necessary to put this ruling in context.
It has long been the law in Connecticut that "A landowner cannot collect surface water in an artificial volume and turn it from its natural course in an increased volume upon his neighbor's land to his substantial injury." Melin v. Richman,96 Conn. 686, 688 (1921). At the same time, as Chief Justice Maltbie stated in Tide Water Oil Sales Corporation v. Shimelman,114 Conn. 182, 184 (1932): ". . . under our law as it has long been settled, an owner of land has the right to occupy and use it as he sees fit, generally speaking, by changing its surface or erecting structures upon it, despite the fact that such a use will cause surface water falling upon it or naturally flowing CT Page 1134 over it from adjacent lands to accumulate upon the latter or to pass over them in changed direction or quantity." In Tide Water, the court also noted that "It must be recognized that the great majority of courts throughout the country have held that a duty rests upon a lower proprietor of land over which surface water runs through a natural drainway not to close it up so as to prevent the surface water from an upper proprietor flowing off in it." Id. at 185. Tide Water also affirmed the principle that a landowner "may not use or improve his land in such a way as to increase the total volume of surface water which flows from it to adjacent property, or as to discharge it or any part of it upon such property in a manner different in volume of course from its natural flow, to the substantial damage of the owner of that property." Id. at 189-90. Injunctive relief has been ordered to abate a nuisance involving the injurious flow of water from one landowner's property onto another. See, e.g., Taylor v. Conti,149 Conn. 174 (1962); Ferri v. Pyramid Construction Co.,186 Conn. 682 (1982).
In the case of Page Motor Co. v. Baker, 182 Conn. 484, 488-89
(1980), our Supreme Court adopted a rule of"reasonable use," stating that "the landowner, in dealing with surface water, is entitled to take only such steps as are reasonable, in light of all the circumstances of relative advantage to the actor and disadvantage to the adjoining landowners, as well as social utility. Ordinarily, the determination of such reasonableness is regarded as involving factual issues to be determined by the trier." In Page Motor, the court affirmed the decision of the referee, finding that the plaintiff could not prevail because it was not able to establish that the defendant's conduct was a substantial factor in causing the damage it suffered. For a detailed discussion of the factors to consider in determining whether a use is "reasonable," see Walton v. Town of NewHartford, 1991 WL 29350 (Super Ct. 1991), aff'd 223 Conn. 155
(1992)
Discussion of Evidence
I see no need to review the facts in exhaustive detail, however, a brief discussion of the nature of this dispute is necessary to place this decision in context. This summary is in no way intended to provide a complete description of the extensive and sometime technical testimony which was given.
The plaintiff, Benjamin Bielonko, Trustee of the Bielonko CT Page 1135 Brothers Farm Trust, is the owner of 62-acres of land (referred to as the Brickyard Farm) in Suffield east of Route 159, a state road also known as East Street Plaintitfs had farmed the land before purchasing it in January 1998 for $450,000, growing hay. The Bielonkos operate over 300 acres of farmland. For the prior four years, approximately, they grew tobacco as well on 10 acres of the parcel at issue. In January, 1998, defendant Donna Blanchette purchased a parcel of land located on the opposite side of Route 159 from the Bielonko property. The property, approximately 8 acres, was located southwest of the intersection of Route 159 and Thrall Road. It was purchased to be developed. Mrs. Blanchette received necessary approvals from the Suffield Inland Wetlands Commission and the Suffield Zoning and Planning Commission to subdivide the parcel into eight residential lots. Mrs Blanchette and her engineer, Leonard Norton, met with Town Engineer Gerald Turbet to discuss the proposed drainage system. Initially, Mrs. Blanchette had planned on developing a nearby 20.8 acre parcel of land as well, .but she decided not to in consideration of the town's views. As of the date of the hearing, three of the lots — lots 1, 2 and 3 — had been conveyed.
The Blanchette property, which the undersigned judge personally viewed, generally slopes from west to east toward Route 159. The level of Route 159 is higher than the level of the Blanchette property at the property line. A drainage pipe was installed, as early as 1972, in Route 159 to allow surface water to flow from the Blanchette property toward the direction of the Bielonko property. Water has drained across the Bielonko property from the upland area, to the west, since at least 1972, traveling through the cross culvert operated and maintained by the state. Also in 1972, the plaintiff's predecessor in title conveyed to the town an easement to perpetually maintain a surface drainage system, including the right to lay, construct, maintain, alter, repair and replace the same" in a fifteen-foot-wide strip of land. This strip starts at the plaintiff's East Street property line and runs, in a generally easterly direction, for approximately 136 feet. As a condition of being permitted to develop the property, the town required Mrs. Blanchette to install a detention basin, a manmade storage area that collects and holds water temporarily during periods of rainfall, then discharges the water through a piped outlet, reducing the velocity of flow.
Surface water flowing to the south side of Thrall Road, along the Blanchette property, flows toward Route 159 in an easterly CT Page 1136 direction. Water from the north side of Thrall Road sometimes crosses the road to the north side of the Blanchette property, and then flows easterly to a swale, created by the state, that directs water from Thrall Road onto the Blanchette property, and then to the culvert pipe.
In developing the property for sale, grading occurred around the foundations of houses to direct the water away from those foundations. Construction also resulted in the stripping of topsoil to put in sewer and water lines, as required by the town. At the time of the hearing, the grass, which had previously been removed, had been substantially replaced.
The Bielonkos testified that, as a result of the development of the Blanchette property, there had been a substantial increase in the flow of water onto their property. To alleviate the problem which they attributed to the Blanchette development, the Bielonkos dug a trench on their property to divert surface water from its previously established course. Some of the erosion and sedimentation described by plaintiffs occurred after the digging of the trench, which lacked erosion controls. Offering photographs and videos, they testified that this increased flow had inundated their tobacco field, substantially damaging their tobacco crop and their ability to harvest it in a timely and economical fashion. Plaintiff's Exhibits 9 and 10 — videotapes admitted over objection — show, among other things, significant amounts of water rapidly coursing through the Bielonko property during the time in question. Benjamin Bielonko estimated that lost profits attributable to this had amounted to approximately $65,000 in total, in 1998, although no documentation whatever was offered in support of this claim.
Glenn Mirtl, an engineer, testified for plaintiffs. Leonard Norton, also an engineer, testified for defendants. The town called town engineer Gerald Turbet to testify. These engineer witnesses provided detailed testimony, concerning, among other things, calculations they performed in analyzing the volume and rate of water flow as it pertained to the areas in dispute; they testified about their personal observations and knowledge of the sites; they stated opinions about soil conditions; and they also gave various expert opinions about numerous matters.[3] Mr. Turbet and Mr. Norton testified that the "rational method" — a methodology used to calculate peal; rates of flow before and after development for rainfalls of different severities — was an acceptable method for designing detention basins for small CT Page 1137 drainage areas. This was the method used by Mr. Norton. Mr. Mirtl testified that the "rational method" was appropriate, but that he preferred a different method.
All three engineers agreed that the peak rates of flow following development would be substantially reduced over the peak rates of flow prior to development. Mr. Mirtl testified that his initial calculations of the volume of water expected to flow through the detention basin was based on an obsolete subdivision plan which involved the additional parcel of land Mrs. Blanchette had decided not to acquire, and thus a larger drainage area. This resulted in greater estimates of runoff than were called for. He performed updated calculations when informed of this. He also testified that he did not know if additional flows of water would soak into the ground of the Bielonko property because it depended in part on the condition of the ground at the relevant time period. He indicated that he did not know where on the property the extra amounts of water would go.
Mr. Mirtl estimated that the post-development peak flow rate would be reduced by the detention basin after development from the rates that existed before development, for one-year, five-year, 25 year and 100 year storms. He also testified that the volume of water discharged from the Blanchette property to the Route 159 drainage pipe would increase by various amounts depending on the severity of the storm (e.g., from 213,000 gallons to 239,000 gallons, or 12 percent for a one-year storm), post-development.
Defendant offered rainfall data from the National Oceanic and Atmospheric Administration (NOAA) measuring the amount of rainfall from various locations in Connecticut, including the measuring station at Bradley Field in Windsor Locks, located approximately five miles from plaintiff!s property.
Having considered the full record, including the available transcripts, which I have read, all of the exhibits, and the detailed proposed findings of fact and conclusions of law submitted by the parties, I conclude that plaintiffs request for temporary injunctive relief must be denied because plaintiffs have failed to demonstrate a likelihood of success on the merits in demonstrating that the Blanchette's uses of the subject property was not reasonable. Page Motor Company v. Baker; Waltonv. Town of New Hartford. Plaintiffs have not to date proven that the development of the Blanchette property — rather than other CT Page 1138 events — was a "substantial factor" in causing the harm of which they complain. The reasoning behind this conclusion is as follows.
First, to summarize, it is clear that Mr. Mirtl differed from the other engineer witnesses in substantial respects concerning the likely impact of the Blanchette development with respect to the resulting water flow onto the Bielonko property. However, as the Blanchette defendants argue in their December 11, 1998, Post-Hearing Brief, see proposed findings of fact 64-68, the available NOAA data indicates that rainfall for May, 1998, totaled 7.84 inches and 7.18 inches for June, 1998. Defendant's Exhibit L. No expert testimony was provided with respect to these numbers. Nonetheless, comparison of these numbers — totaling over 15 inches for the two months at issue — makes it clear that the rainfall for the time period in question was unusually high when compared against the available figures for the same months in previous years. Having viewed the site, reviewed the tapes introduced by plaintiffs, (Plaintiff's Exhibits 9 and 10), and observed their testimony, I see no reason to doubt the sincerity of the Bielonko's belief that there is a direct, casual relationship between the development of the Blanchette property and the problems they experienced this past year. Their view as farmers familiar with the land, and their crop, must be respected. However, the facts developed at the hearing indicated that the matter may not be quite so simple and that the causal connection might not be so direct. On the present record, therefore, in light of the NOAA data there is a substantial possibility that the problems the Bielonkos experienced were to a large extent the result of this substantial amount of rainfall, and an anomaly, not a consequence of the Blanchette development likely to recur.
Second, but closely related to the above, it is important to note the testimony and absence of testimony — concerning the nature of the soil and the impact of heavy rainfall on the Bielonko property. Mr. Mirtl testified that among the factors which influence whether or not water can soak into the ground are the type of soil, the amount of water before and after the event being examined, and the amount of saturation in the soil at the time a rainfall happens. The soil in the vicinity of the Bielonko property was identified as Class C soil, described as having a less than average ability to absorb water. However, Mr. Mirtl conceded that he did not know if the water under discussion would soak into the ground because it depended on the condition of the CT Page 1139 ground at the time of the event under discussion. Transcript at 218. He also said he did not know where on the property the extra amount of water would go. Transcript at 218-219. Plaintiffs provided no expert testimony to further elucidate this point. This becomes significant in light of the fact that, as Mr. Turbet made clear, the Bielonko property is generally within a wetlands area, and contains a good deal of wetlands soil — estimated to be at 50 to 60 percent of the area. Plaintiff's Exhibit 2. The area under discussion is a "fairly poor drainage area," Mr. Turbet said, and during and after rainstorms, water will often pond along the side of East Street because there "is not much of the water that goes into the soil in these areas." Mr. Turbet testified that wetlands soils are impervious soils, "dense soils that do not accept water very well." Transcript at 338-340. In combination with the evidence concerning the unsual amount of rainfall during the subject time periods, this increases the likelihood that the problems the Bielonkos experienced on this one occasion were caused not by the Blanchette development, but by a combination of soil and climactic conditions.
Finally, there is the question of the trench which the Bielonkos dug on their property to divert surface water from its long-established course, as found on the town's drainage easement. Defendant's Exhibit A. The town, in its December 10, 1998, proposed findings of fact, suggests a finding that plaintiffs' actions had the effect of redirecting the flow of water from the course it had followed for decades, causing severe erosion, and toward a different portion of the plaintiffs' tobacco crop. The town suggests that while the water had previously followed a different, curved path, after the trench was dug, the flow of water was directed toward the center of the crop. Town's Proposed Findings of Fact C and D. The Blanchette defendants take a similar view. See Their Post-Hearing Brief, Proposed Findings of Fact 73-80. Plaintiffs' written submissions do not address this significant point in detail. There evidence on this point is not sufficiently well developed to permit any sound conclusion to be drawn. Based on the present record, therefore, I reach no conclusion as to the effect the Bielonkos' efforts concerning the trench had on the problem which they were experiencing, except to note that their efforts to ameliorate the significant problem they were experiencing were understandable.
Summary and Conclusion
It is important to stress that the conclusion here reached is CT Page 1140 a limited one, based on the present state of the record, and in the procedural context of the pending application for a temporary injunction and motion for discharge of lis pendens. It is also reached in light of the clear legal requirement that the plaintiff bears the heavy burden of proving that the issuance of a temporary injunction, an extraordinary remedy, is appropriate. See the above discussion of legal requirements relating to the issuance of injunctive relief. The parties are reminded that further evidence, expert opinion, and subsequent events — including a recurrence of last year's problems — could put matters into a different light at a future hearing on a permanent injunction. They are also reminded that the denial of the request for temporary injunctive relief, and the granting of the motion to dismiss the lis pendens, does not end this litigation insofar as plaintiffs may attempt to recover money damages for the wrong they believe they have suffered. See, e.g., Bauby v. Krasow,107 Conn. 109, 116 (1927). Therefore, given the importance of the matters involved to the parties, and the difficulty in determining what the future course of this case will be, the court urges the parties to redouble their efforts to negotiate a resolution to this dispute, rather than submit to the future cost, expense, and time which continued litigation will inevitably bring about.[4]
To summarize, I conclude that, based on the present record, given the different variables present in addition to changes occasioned by the development, the plaintiff has failed to demonstrate that there is a likelihood of success on the merits because the plaintiff has failed to prove that the conduct and action of the defendants have proximately caused the harm complained of. More specifically, while the evidence suggests that defendants' conduct might be a contributing factor to the problem to some extent, Ferri v. Pyramid Construction Company, supra, it does not presently rise to the level of demonstrating that defendants' conduct is a substantial factor in causing the problem complained of, due to heavy rain and soil conditions.
Conclusion
For the reasons stated above, plaintiff's application for a temporary injunction is denied and defendants' motion to discharge notice of lis pendens is granted.
______________________ Douglas S. Lavine CT Page 1141 Judge, Superior Court